## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

AARON HERMAN, AHARON STEFANSKY, ALPHARD GROUP LLC, AVROHOM MEISELS, BENZION HALPERT,  BHY NY LLC, CLEARCUT GLASS LLC,  ELI EISENBACH, HALPERT FAMILY HOLDING LLC, HOTEL LAKE CHARLES LLC, ISRAEL SCHWARTZ, LELOV INVESTMENTS LLC, MEYER GODINGER, MORDECHAI BERNFELD, SHEA OSHER RABINOWITZ, ZE ESTATES LLC AND ZELIG EISENBACH
                    Plaintiffs,

            v.

ABRAHAM BODEK AKA LAZER BODEK, PARK AVE CAPITAL III LLC, AND PARK CAPITAL ACQ LLC

No. 3:25-cv-1511

**JURY TRIAL DEMANDED**

## COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiffs AARON HERMAN, an individual; AHARON STEFANSKY, an individual;

ALPHARD GROUP LLC, a New York Limited Liability Company; AVROHOM MEISELS, an

individual; BENZION HALPERT, an individual;  BHY NY LLC, a New York Limited Liability

Company; CLEARCUT GLASS LLC, a New Jersey Limited Liability Company; ELI

EISENBACH, an individual, HALPERT FAMILY HOLDING LLC, a New Jersey Limited

Liability Company; HOTEL LAKE CHARLES LLC, a New York Limited Liability Company,

ISRAEL SCHWARTZ, an individual; LELOV INVESTMENTS LLC, a New Jersey Limited

Liability Company; MEYER GODINGER, an individual; MORDECHAI BERNFELD, an

individual; SHEA OSHER RABINOWITZ, an individual; ZE ESTATES LLC, a New Yok

Limited Liability Company and ZELIG EISENBACH, an individual ("Plaintiffs"), by their

undersigned counsel, as and for their Complaint against ABRAHAM BODEK AKA LAZER BODEK, an individual ("Bodek"); PARK AVE CAPITAL III LLC a Delaware Limited Liability Company ("Park Ave"), and PARK CAPITAL ACQ LLC a Louisiana Limited Liability Company ("Park CAP", collectively, "Defendants"), allege as follows:

## NATURE OF ACTION

1.    This is an action for an accounting, recovery of fraud and misrepresentation, violations of state and federal securities laws, and mortgage and bank fraud, arising out of the raising of funds done by a serial fraudster, Defendant Abraham Bodek, who utilized his position in the Ultra-Orthodox Jewish Community in order to induce and solicit investment funds from the Plaintiff investors (collectively, the "Investors"), skirting both state and federal securities laws that were enacted to protect investors from fraud, utilizing the illegal gains in order to purchase a property, and hiding the chain of title such that the investors cannot recover the assets of the investment company.

2.    When asked for information over the years, Bodek employed a series of false and misleading representations to delay and obfuscate -- all of which resulted in a devastating economic loss to Plaintiffs.

3.    Upon information and belief, based on comparison of documents, on research of Small Business Authority ("SBA") loan platform, Bodek also applied for and obtained a loan without Plaintiff's acquiescence, in the name of Defendants with Plaintiff as a co-borrower.

4.    Plaintiffs have demanded, via counsel, and by a special meeting of the members of the PARK AVE CAPITAL III LLC, a full accounting of the Limited Liability Company. Defendants have refused to comply with this demand.

5.    Plaintiffs therefore are forced to bring this action to recover from Defendants the lucrative

financial assets taken from them under fraudulent pretenses, and to preserve their rights under the law.

## PARTIES, JURISDICTION AND VENUE
### The Parties

### A. Parties Plaintiff

6.      The Individual Plaintiffs are the owners of five Limited Liability Companies that collectively invested over $2,400,000.00 in Defendant Park Ave.  There is another non-party investor who has also invested.

7.      Plaintiff AARON HERMAN ("Herman") is a New Jersey domiciled individual, and a partial owner of Plaintiff CLEARCUT GLASS LLC ("ClearCut Glass").  Herman lives at 946 Park Ave., Lakewood, NJ 08701.

8.      Plaintiff AHARON STEFANSKY ("Stefansky") is a New York domiciled individual, who owns Plaintiff ALPHARD GROUP LLC ("Alphard Group") together with Plaintiffs Rabinowitz, E. Eisenbach and Z. Eisenbach.  Stefansky lives at 1664 55th St., Brooklyn, NY 11204.

9.      Plaintiff AVROHOM MEISELS ("Meisels") is a New Jersey domiciled individual who owns Plaintiff LELOV INVESTMENTS LLC ("Lelov Investments"). Meisels lives at 33 Bradhurst Ave., Lakewood NJ 08701.

10.      Plaintiff BENZION HALPERT ("Halpert") is a New Jersey domiciled individual who owns HALPERT FAMILY HOLDING LLC ("Halpert Family Holdings").  Halpert lives at 123 Harvard St., Lakewood, NJ 08701.

11.      Plaintiff ISRAEL SCHWARTZ ("Schwartz") is a New Jersey domiciled individual, and a partial owner of Plaintiff ClearCut Glass.  Schwartz lives at 1481 Pasadena St, Lakewood, NJ 08701.

12.    Plaintiff MEYER GODINGER ("Godinger") is a New York domiciled individual, who lives at 164 Rodney St., Brooklyn, NY 11211.

13.    Plaintiff MORDECHAI BERNFELD ("Bernfeld") is a New Jersey domiciled individual a partial owner of Plaintiff ClearCut Glass.  Bernfeld lives at 5 Shilo Road, Lakewood, NJ 08701.

14.    Plaintiff SHEA OSHER RABINOWITZ ("Rabinowitz") is a New York domiciled individual, who owns Plaintiff Alphard Group together with Plaintiffs Stefansky, Z. Eisenbach and E. Eisenbach, and also owns Plaintiff BHY NY LLC ("BHY NY").  Rabinowitz lives at 107 Parkville Ave., Brooklyn NY 11230.

15. Plaintiff ZELIG EISENBACH ("Z. Eisenbach") is a New York domiciled individual, who owns Plaintiff Alphard Group LLC.  Z. Eisenbach lives at 90 Hewes St Brooklyn, NY 11249

16. Plaintiff ELI EISENBACH ("E. Eisenbach") is a New York domiciled individual, who owns Plaintiff Alphard Group LLC.   Z. Eisenbach lives at 40 Middleton St apt 5A, Brooklyn, NY 11206

17.    Plaintiff ALPHARD GROUP LLC ("Alphard Group") is a New York Limited Liability Company, that was formed on September 2, 2020. Its address is 66 Chestnut Street, Suite 8, Yonkers, NY 10701.

18.    Plaintiff BHY NY LLC ("BHY NY") is a New York Limited Liability Company, that was formed on August 2, 2022. Its address is 1274 49th St., STE 601, Brooklyn, NY,  11219.

19. Plaintiff CLEARCUT GLASS LLC ("ClearCut Glass") is a New Jersey Limited Liability Company, that was formed on May 7, 2007.  Its address is 1758 Ridge Avenue Lakewood, NJ 08701.

20.    Plaintiff HALPERT FAMILY HOLDINGS LLC is a New Jersey Limited Liability

Company that was formed on April 11, 2016.  Its address is 123 Harvard Street, Lakewood, NJ 08701.

21.     Plaintiff HOTEL LAKE CHARLES LLC is a New York Limited Liability Company that was formed on May 23, 2024.  Its address is 164 Rodney St., Brooklyn, NY 11211.

22.     Plaintiff LELOV INVESTMENTS LLC is a New Jersey Limited Liability Company that was formed on October 23, 2019.  Its address is 33 Bradhurst Ave., Lakewood NJ 08701.

23.     Plaintiff ZE ESTATES LLC is a New York Limited Liability Company that was formed on July 29, 2020.  Its address is 90 Hewes Street, Brooklyn, NY 11249.

### B.  Parties Defendant

24.     Defendant ABRAHAM BODEK A/K/A LAZER BODEK ("Bodek") is a New Jersey Domiciled individual with an address of 10 Park Slope Terrace, Lakewood, NJ 08701.

25. Defendant PARK AVE CAPITAL III LLC ("Park Ave") is a Delaware Limited Liability Company, that was incorporated on August 25, 2021.  Its address for service of process with the Secretary of State for the State of Delaware is 16192 Coastal Highway, Lewes, DE 19958-3608. Its business address is 10 Park Slope Terrace, Lakewood, NJ 08701.

26. Defendant PARK CAPITAL ACQ LLC ("Park CAP") is a Louisiana Limited Liability Company, with an address for service of process with the Louisiana Secretary of State of 201 Rue Beauregard, Ste 202, Lafayette, LA 70508.  Its mailing address is C/O ABRAHAM BODEK, 426 Herbertsville RD, FL 3, BRICK, NJ 08724.  It was formed as a Member-Managed LLC by Abraham Bodek on September 13, 2021.

### C.  Jurisdiction and Venue

27. Jurisdiction of this Court is founded upon 28 U.S.C. § 1331. The federal claims asserted

5

herein arise under Section 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

28. Additionally, the Court has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367(a), involving claims that are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

29. This Court has personal jurisdiction over the defendants because: (a) at least one of the defendants operates an entity that is present and/or doing business within this jurisdiction, (b) at least one of the defendants resides and works within this jurisdiction, and (c) the defendants' tortious activity occurred within this jurisdiction.

30. Venue is proper in this district because this is the judicial district where the Defendant Bodek resides (28 U.S.C § 1391(b)(1)); venue is also proper in this district because a substantial part of the events or omissions giving rise to the claim occurred in this district (28 U.S.C. § 1391(b)(2)).

## GENERAL FACTUAL ALLEGATIONS

### D.  Background

31. The relevant period for the solicitation of the investments is the period starting April 2021 through December 2021 (the "Solicitation Period").

32. During the Solicitation Period, Defendant Bodek solicited investments from the Plaintiffs, some of whom he had a prior relationship with, some of whom were introduced to him by other investors, and some of whom were introduced to him by other Plaintiffs.

33. The goal of the solicitation of the investments was to purchase a hotel located at 401 N

Lakeshore Dr, Lake Charles, LA, known as the Marco Hotel (the "Property" or the "Hotel").

34. The Ultra-Orthodox Jewish Community is a very close-knit community. Of particular note is that the Investors and the Defendant Bodek are all part of either the greater Lakewood, NJ community or Brooklyn, NY community. The Investors are friends with prior relationships who work together, pray and worship together, send their children to the same schools and summer camps. Bodek preyed upon those relationships and utilized his connections with one Investor to introduce him to another.

### E.  The Investors

### Meyer Godinger and Hotel Lake Charles LLC

35. Plaintiff Godinger has the longest relationship with Defendant Bodek. Originally connected and introduced to Godinger through a mutual relative, Bodek cultivated the relationship.

36. Godinger and Bodek engaged in two minor real estate transactions during the period of 2019-2021, where they realized approximately $50,000.00 in profits.

37. By enticing Godinger with these quick profits, Bodek was able to rope Godinger in and win his trust.

38. In the end of July 2021, Bodek introduced Godinger to the opportunity to invest in the Property.

39. During July and August, Bodek solicited Godinger to share the Property and a version of the model, a copy of which is attached hereto as **Exhibit A**, with various potential investors.

40. Bodek shared the following description via WhatsApp to Godinger, on August 12, 2021:

> As discussed please see below and attached model outlining the details of the
> deal, as well as market info and other relevant items.
> The asset is located in the heart of Lake Charles Louisiana, a core transient,
> business and leisure market.
> The transient market is based around the local casinos which are the closest
> casinos to Houston and see traffic  directly from Houston and surrounding

areas.

The business segment is based around oil and gas production, oil refineries, petrochemical and industrial manufacturing, with many of the biggest oil and liquid petroleum companies operating out of Lake Charles, companies include Philips, Citgo, Sasol and PSX among many others.

Additionally the market is absorbing over 7.5 billion dollars of insurance money from last years hurricanes which is creating a bigvboom [sic] in the local economy and driving unprecedented jobs and other opps locally.

As depicted in the attached spreadsheet, this asset has been performing extremely well and has consistently done around 1M a year net before debt, all while current management is not reinvesting a dollar and runs an extremely short sighted operation. This property can easily achieve 1.5M + a year with a similar setup and creative market strategy using proper vision and focusing on offering a more competitive product.

Specific details, historic budgets, income/expenses and projections can be found inside the spreadsheet and I am happy to discuss any specific concerns.

 I am are confident that this asset has massive potential, and we intend to implement a solid plan to drive additional traffic, go after direct sales and target the local business community all while bettering the property and offering a product which will be competitive to the market, drive additional sales and cause the asset value to soar.

This is a rare opportunity to take part in something that's actively doing great with tremendous upside.

Feel free to reach out to me to discuss.

41. Around mid-October 2021, Godinger introduced Bodek to Zelig Eisenbach, who introduced Shea Osher Rabinowitz and Aharon Stefanksy to Bodek.  They had a meeting at Eisenbach's office at 577 Flushing Ave., Brooklyn, NY.

42. Ultimately, all these Investors joined the Investment.

43. Godinger himself invested $300,000.00 (the "Godinger Investment").

44. Godinger did not receive any Prospectus, nor was Godinger ever informed whether or not the Membership Interests were registered securities pursuant to either the New Jersey Uniform Securities Law (1997) (N.J.S.A § 49:3-47 *et seq*), the federal Securities Act of 1933, 15 USCS § 77a *et seq*, or any other equivalent state law.  Nor did he receive information that such securities were exempt from registration.

45. Godinger received the attached financial models, attached as **Exhibit A** as of the following

dates:

  a.  7/28/21, 6:01:58 PM: LakeCHA Hotel Acquisition Model V6.1Final .xlsx • 5 sheets
  b.  7/29/21, 6:33:01 PM: LakeCHA Hotel Acquisition Model V6.3Final .xlsx • 6 sheets
  c.  8/12/21, 3:26:41 PM: LakeCHA Hotel Acquisition Model V6.5 UPdated.xlsx • 7 sheets
  d.  8/19/21, 9:46:42 PM: Copy of LC Hotel Model_v8.3 Final with Refi.xlsx

46. In the beginning of November, 2021, Bodek asked Godinger via a phone conversation, to send Bodek personal checking statements of Godinger's checking account, ostensibly in order to show assets of Godinger's to the bank that would be financing the purchase of the Hotel. Godinger sent such statements on November 5, 2021.

47. On November 30, 2021, Bodek asked Godinger to send a wire, in the amount of $70,000.00 to Bodek's account, for the purpose of making sure that it "appeared on the statement."

48. On December 6, 2021, after calling Godinger, Bodek again asked Godinger, via a phone conversation, to send Bodek his personal checking statements.

49. The following day, December 7, 2021, he asked Godinger to fill and sign a "Customer Information Form" from Celtic Bank, a copy of which is attached to this Complaint as **Exhibit B**.

50. On December 9, 2021, he again asked Godinger for bank statements. Godinger sent via WhatsApp two business bank statements.

51. On January 5, 2022, Bodek informed Godinger that the deal had closed.

52. Around mid-September 2023, Defendants made their first Capital Call (the "September 2023 Capital Call"), in order to raise capital for rehabilitation of some of the Hotel. Bodek shared the following information with the Plaintiffs:

| Item Name | >>>> | Amount | Item Name2 | >>>3 | Amount4 | Item N. |
|---|---|---|---|---|---|---|
| Shower doors | | $ 9,900.00 | | | | |
| Linen | | $ 7,500.00 | | | | |
| Room PTAC Units | | $ 4,900.00 | | | | |
| Signage | | $ 22,000.00 | | | | |
| Trash Enclosure | | ??? | | | | |
| Public Bathrooms | | $ 16,000.00 | | | | |
| Gzeboo | | $ 8,500.00 | | | | |
| Fence | | ??? | | | | |
| Sleepers | | $ 49,000.00 | | | | |
| Amenties | | $ 4,000.00 | | | | |
| Gym Refresh | | $ 1,600.00 | | | | |
| Lobby Funrniture | | $ 26,000.00 | | | | |
| Breakfast Serving Items | | $ 5,400.00 | | | | |
| Art Work | | $ 19,000.00 | | | | |
| Parking Lot Restriping | | $5900?? | | | | |
| First Floor Corridor Install | | $ 9,500.00 | | | | |
| First Floor Lighting Install | | $ 1,900.00 | | | | |
| Corridor Paint | | $ 8,900.00 | | | | |
| Elevator Refresh | | $ 3,200.00 | | | | |
| Carpet Install | | $ 8,900.00 | | | | |
| Construction 1st &2nd Remain | | $ 14,000.00 | | | | |
| New Images Web | | $ 2,300.00 | | | | |
| Lobby Freezer | | $ 2,900.00 | | | | |
| **Total** | | **$225,400.00** | Total | | $ - | Total |

53. Godinger's contribution was an additional $20,967.00, which he paid in October.

54. By February 2024, Godinger started to ask for monthly updates, as he was beginning to become concerned.

55. He repeatedly asked for updates in March and April 2024, including specifics as to the profitability of the Hotel Project:

> [2/8/24, 1:18:00 PM] Bodek: Quick update we bh opened this week under the new brand! Things are slowly falling into place a lot going on a short way to go but looking good feedback is great
> [2/8/24, 1:19:00 PM] Godinger: Great I think you should share it in an email and be a little more specific
> [2/8/24, 1:40:17 PM] Bodek: Iyah
> [3/26/24, 3:19:42 PM] Godinger: Hi how are you. Any update?
> [3/26/24, 3:21:37 PM] Godinger: Report?
> [4/1/24, 6:14:03 PM] Godinger: ?
> [4/1/24, 8:56:48 PM] Bodek: Hi, it's been a while. How is everything?
> [4/1/24, 8:57:12 PM] Bodek: You saw the Feb update I sent out?
> [4/3/24, 3:57:25 PM] Godinger: No
> [4/3/24, 3:58:16 PM] Godinger: Last is this. I am sure that's not what you

> meant
> [4/3/24, 7:33:44 PM] Bodek: This.
> Brief recap with February numbers.
> Gross revenue 117k
> Avrgae rate $90
> We had a fair bit of group business, which helped us achieve these numbers.
> We're getting a good response on customer traffic, but we're still underperforming the market.
> Group business is key right now, so we maintain cash flow.
> Also, keep in mind that we have ceased selling non renovated rooms to non groups so we can avoid negative reviews and bad reputation.
> [4/4/24, 9:56:40 AM] Godinger: Are you happy with march ?
> [4/9/24, 1:28:38 PM] Godinger: Did you make or lose or break even that month?
> [4/9/24, 1:59:36 PM] Bodek: We didn't cover in March.
> [4/9/24, 2:12:12 PM] Godinger: Feb?
> [4/9/24, 2:13:00 PM] Bodek: Feb Covered bh,
> [4/9/24, 2:14:20 PM] Godinger: What was gross revenue for march
> [4/9/24, 2:22:20 PM] Bodek: Have to check will send soon.

56. On May 9, 2024, Godinger asked, via WhatsApp voice note, for April 2024 and May 2024 numbers. He then asked later that day again, when he received no response from Bodek.  Bodek replied "I will send an email full breakdown"

57. On May 15, 2024, when no reports were forthcoming, Godinger asked again for reports, saying that the other Investors were getting upset.

58. On May 23, 2024, Godinger formed Plaintiff Hotel Lake Charles LLC, and transferred his membership interests into the LLC.  Bodek issued all K1s to that entity.

### Clearcut Glass LLC – Mordechai Bernfeld, Israel Schwartz and Aaron Herman

59. Plaintiff Clearcut Glass LLC is a New Jersey Limited Liability Company, owned by Plaintiffs Mordechai Bernfeld, Israel Schwartz and Aaron Herman (the "Clearcut Investors"). Located in Lakewood, NJ, Clearcut Glass provides glass and aluminum commercial exteriors for

office buildings, community centers, commercial buildings, shopping centers, strip malls and schools.  It also provides shower enclosures, glass railings and more products, for both commercial spaces and residential homes.  Through the Clearcut Glass business, Bernfeld, Schwartz and Herman often invest in other businesses, in order to diversify.

60. Herman was friends with Godinger for many years.  Godinger introduced the Clearcut Investors to Defendant Bodek in April 2021, in relation to a different deal in Philadelphia that fell through.

61. On August 4, 2021, Bodek introduced the Clearcut Investors, by way of WhatsApp conversation with Bernfeld, who ran point for the Clearcut Investors, to the Hotel Investment.

62. On August 15, 2021, Bernfeld introduced Bodek to Meisels from Lelov Investments LLC.

63. Ultimately, the Clearcut Investors contributed $225,000.00 to the Hotel Investment, on or around October 12, 2021.

64. The Clearcut Investors did not receive any Prospectus, nor were the Clearcut Investors ever informed whether or not the Membership Interests were registered securities pursuant to either the New Jersey Uniform Securities Law (1997) (N.J.S.A § 49:3-47 *et seq*), the federal Securities Act of 1933, 15 USCS § 77a *et seq*, or any other equivalent state law.  Nor did the Clearcut Investors receive information that such securities were exempt from registration.

65. The Clearcut Investors received the attached financial models, attached as **Exhibit A** as of the following dates:

   a. 8/4/21, 12:20 PM LakeCHA Hotel Acquisition Model V6.3Final .xlsx
   b. 8/15/21, 11:26 PM - Lazer Bodek Lakewood: LakeCHA Hotel Acquisition Model V6.5 UPdated copy.xlsx

66. On November 1, 2021, through a WhatsApp voice note to Bernfeld, Bodek asked Bernfeld, "I just wanted to give you a heads up that I have to give the bank the name and email address for

the investors, so I'm trying to be as limited as possible and not share too much. They probably… they might email you for confirmation, please reach out to me and be in touch with me about anything. Is that OK? Kindly confirm because I don't want anything to get more 'farhocked'"

67. Bernfeld responded via WhatsApp, "Sure".

68. On November 5, 2021, via a phone conversation, Bodek asked Bernfeld for a screenshot of his Bank Balances. Bernfeld provided the image below, via WhatsApp, asking if it was good, to which Bodek replied, "Perfect. Thanks.":



[Screenshot redacted for privacy]

69. On December 6, 2021, by phone, Bodek asked Bernfeld to provide another screenshot of

his accounts.  Bernfeld provided the following screenshot:



[Screenshot redacted for privacy]

70. Bodek asked Bernfeld by WhatsApp voicenote "Can I hassle you to send it to me the same way, so I don't give them more stuff for me to do," and then he said in Yiddish, "if you understand what I mean"

71. Bernfeld, not understanding what Bodek wanted, said that he thought he sent it the same way last time, also.

72. Bodek replied, by forwarding the previous image shared on November 5, 2021, in ¶ 68 above, with the following WhatsApp voicenote "Like this, click on this picture, it has a name, Bernfeld, on there, that's why I didn't use the name Clearcut Glass, and I don't want them to, you know, start then, new questions, cause I'm losing my mind with them."

73. Bernfeld then sent the attached screenshot, which, apparently, was sufficient for Bodek's

purposes:



[Screenshot redacted for privacy]

74. On December 7, 2021, by phone, Bodek told Bernfeld that he needed him to sign a "Customer Information Form" from Celtic Bank, a copy of which is attached to this Complaint as **Exhibit B.** Bodek did not tell Bernfeld, at any time, that he intended to name Bernfeld on the loan in any way.

75. On January 5, 2022, Bodek informed Bernfeld that the deal closed.

76. On February 17, 2022, via WhatsApp message, Bodek told Bernfeld that his ownership percentage was 7.148%.

77. For that calculation to be accurate, Bodek would have had to raise a total of $ 3,147,733.63.

78. On September 21, 2023, Bodek asked for a Capital Contribution in order to continue with renovations. For the Clearcut Investors, collectively, the Capital Contribution was $15,728.

79. On September 27, 2023, Bernfeld directly asked Bodek if there were any Louisiana K1s for 2022.  Bodek replied via WhatsApp, "The partnership is a Delaware entity".

80. The WhatsApp conversations between Bernfeld and Bodek, from November 2023 until July 2024, are further informative.  (WhatsApp voice notes are transcribed from the original voice files):

11/22/23, 7:37 PM - Bernfeld: How's things going?
11/22/23, 7:45 PM - Bodek: Bh. Making good progress we're aiming to open next month under the new flag.
Talk a little later
12/20/23, 10:56 AM - Bernfeld: How's it going?
12/20/23, 11:31 AM - Bodek: Bh bh catch up later
2/8/24, 1:11 PM - Bodek: Quick update we bh opened this week under the new brand! Things are slowly falling into place a lot going on but looking very good.
2/8/24, 1:11 PM - Bodek: We can schmooze later for full details.
2/8/24, 2:50 PM - Bernfeld: PTT-20240208-WA0042.opus (file attached)
*Transcription "Gevaldig, Boruch Hashem! Can I make a suggestion, I think I told you this earlier, send out an email, to everybody, I think its just going to put, cause I started hearing back from people and people you know are starting, I don't know, are not too excited, whatever, so send out an email"*
2/9/24, 1:06 AM - Bodek: Iyah
4/11/24, 1:15 PM - Bernfeld: Hello
4/11/24, 1:36 PM - Bodek: How are you?
4/11/24, 1:36 PM - Bodek: Let's connect later
4/11/24, 2:45 PM - Bernfeld: STK-20240409-WA0045.webp (file attached)
5/13/24, 3:43 PM - Bernfeld: 🫣
5/13/24, 4:02 PM - Bodek: PTT-20240513-WA0030.opus (file attached)
*Transcription "Mordechai. Vus macht's du. How are you, I'm just swamped, and not breathing, Ich heint vet bli neder tzrik rifin heint give me a little bit of time as soon as I have a moment I'm going to call you*
5/13/24, 7:29 PM - Bernfeld: I understand you are swamped but I think I'm entitled for an update on email......
5/13/24, 7:45 PM - Bodek: You're right.
6/17/24, 9:22 PM - Bodek: PTT-20240617-WA0085.opus (file attached)
*Transcription "Mordechai. Vus macht's du. How are you, I just met Ari, vi zu heist di, Ari that works for you I forgot his last name, anyways, did you get my email from last week, two weeks ago, never sent it to you?"*
7/1/24, 2:44 PM - Bodek: 🤚
7/1/24, 2:47 PM - Bernfeld: Hi
7/1/24, 2:49 PM - Bodek: PTT-20240701-WA0053.opus (file attached)
*Transcription "Mordechai. Vus macht's du. How are you, I tried calling you a couple of times, I'm not sure if you are not seeing my calls, or you don't want to*

*talk to me, either way, if we can connect, please I would appreciate it, thank you."*
7/1/24, 2:52 PM - Bernfeld: You call me at funny hours 😊
7/1/24, 3:04 PM - Bodek: I hear let me know when works for you.
7/1/24, 3:08 PM - Bernfeld: 6ish
7/1/24, 3:11 PM - Bodek: 👍

81. Around this time, Bernfeld went onto the SBA portal for servicing loans for his own business loans. According to the SBA, on the MySBA Loan Portal, "you can view and make payments towards your SBA loans", ([https://lending.sba.gov/](https://lending.sba.gov/), last visited February 20, 2025).

82. Bernfeld noticed a loan that was associated with his account, which could only be associated with his login through his Social Security Number or EIN. The loan is a loan for $5,000,000.00 underwritten by the SBA, with an SBA loan number of 2869589100, and it is in the name of Defendant Park Capital ACQ LLC:



83. Bernfeld did not authorize or apply for this loan.


**Halpert Family Holdings LLC and Benzion Halpert**

84. Plaintiff Benzion Halpert is the Trustee of Plaintiff Halpert Family Holdings LLC.

85. Halpert was first introduced to Defendant Bodek through a former partner, who did business on a separate real estate deal in Philadelphia.

86. Around August 9, 2021, Bodek met with Halpert, and forwarded him the investment model (version 6.3Final).

87. Halpert Family Holdings invested $500,000.00 in November 2021.

88. The Halpert Family Holdings investors did not receive any Prospectus, nor were they ever informed whether or not the Membership Interests were registered securities pursuant to either the New Jersey Uniform Securities Law (1997) (N.J.S.A § 49:3-47 *et seq*), the federal Securities Act of 1933, 15 USCS § 77a *et seq*, or any other equivalent state law. Nor did they receive information that such securities were exempt from registration.

89. The Halpert Family Holdings received the attached financial models, attached as **Exhibit A**:

      a. LakeCHA Hotel Acquisition Model V6.1.xlsx
      b. 8/9/21: LakeCHA Hotel Acquisition Model V6.3.xlsx

90. On December 07, 2021, by phone, Bodek told Halpert that he needed him to sign a "Customer Information Form" from Celtic Bank, a copy of which is attached to this Complaint as **Exhibit B**. Bodek did not tell Halpert, at any time, that he intended to name Halpert on the loan application in any way.

91. Halpert also participated in the Capital Call in September of 2023.


**Lelov Investments LLC and Avrohom Meisels**

92. Plaintiff Avrohom Meisels was introduced to Defendant Bodek by Bernfeld in the summer of 2021.

93. Meisels speaks mostly Yiddish and does not speak English well. He certainly does not

read English well.  He relied on Bodek's assertions as to the nature of the deal and the documents being signed.

94. Meisels invested in July 2021, through his company, Lelov Investments LLC.

95. Originally, Meisels gave Bodek a check.  When Bodek did not give Meisels an operating agreement, Meisels put a stop on the check.

96. Bodek quickly protested and slapped together papers, in August 27, 2021.  However, the Lelov Operating Agreement was full of errors. For example:

 a. It purported to be the "Amended and restated operating agreement", dated August 27, 2021, yet it stated that the company was formed in "August 24, 20201 [sic]"

 b. Article 4 states that the Purpose of the Company was to " (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 4724 Round Lake Road, Indianapolis, Indiana (the "Property")."

 c. The distributions in the Lelov Operating Agreement (Article 9) are different from all the other Operating Agreements.  In the Lelov Operating Agreement, it states that:

> All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return on its Capital Contribution in accordance with each Member's Capital Percentage Interest and then (ii) to the Members in accordance with each Member's respective Capital Percentage Interest less a 30% promote (the "Promote") to the Manager till the return amounts to a total of 15% annual return, all distributions beyond the 15% shall be split 50% with manager which is set forth on Schedule A and defined in this Agreement as the "Ownership Percentage Interest".

 d. Capital Events are treated differently in the Lelov Operating Agreement. Distributions of capital on sale or refinance are in the Manager's discretion.

19

97. Bodek took advantage of the fact that Meisels could not read English and would not notice that the Property address was incorrect.

98. Ultimately, Meisels and Lelov Investments invested $500,000.00.

99. The Meisels and Lelov Investments did not receive any Prospectus, nor were they ever informed whether or not the Membership Interests were registered securities pursuant to either the New Jersey Uniform Securities Law (1997) (N.J.S.A § 49:3-47 *et seq*), the federal Securities Act of 1933, 15 USCS § 77a *et seq*, or any other equivalent state law.  Nor did they receive information that such securities were exempt from registration.

100.    Meisels also introduced Bodek to a non-party investor, Yoel Rother, who invested $500,000.00.

101.    Bodek attempted to meet with Meisels as recently as November 12, 2024.  When Meisels advised him to meet with the Investors, as a group, he refused to, and said he only wanted to meet with each one individually.  He tried to get Meisels to leave the Beth Din Arbitration and only stopped when Meisels advised Bodek that his Rabbi advised him to proceed with the Beth Din.

### Alphard Group LLC, BHY NY LLC, ZE Estates, Shea Osher Rabinowitz, Ari Stefansky, Zelig Eisenbach and Eli Eisenbach

102.    Plaintiff Zelig Eisenbach was introduced by Godinger in April 2021, regarding an unrelated deal.

103.    In August 2021, Defendant Bodek reached out to Zelig Eisenbach to offer him to participate in the Hotel Project.

104.    Plaintiff Ari Stefansky was introduced by Zelig Eisenbach to Defendant Bodek, around September 2021.

105.     Stefansky introduced his brother-in-law, Shea Osher Rabinowitz to Bodek.

106.     In order to invest in the Hotel Project, Stefansky, Rabinowitz and the Eisenbachs formed Alphard Group LLC (collectively refer to as the "Alphard Group").

107.     Initially, they invested $900,000.00 under Alphard Group LLC.  Ultimately, they reclassified the investment to be $600,000.00 under BHY NY and $150,000 under each of the Eisenbachs. For convenience, this Complaint will refer to the group as the Alphard Group.

108.     The wires were sent to the account of Riverside Abstract, the title company for the transaction, during the period of November and December 2021.

109.     During the course of the conversation between Zelig Eisenbach and Bodek, in September 2021, Eisenbach asked Bodek, via WhatsApp:

> [9/13/21, 1:44:43 PM] Zelig Eisenbach: What is your experience in the hotel business?
> [9/13/21, 1:47:00 PM] Bodek: Many years back office and strategy.... Talk soon I am on the other line
> [9/13/21, 1:47:44 PM] Bodek: I have repositioned, opened and consultad [sic] for many big players.....

110.     While negotiating back and forth between Stefansky and Bodek, they were negotiating language for a side letter.

111.     Ultimately, on November 14, 2021, by both WhatsApp and email, they agreed:

> [11/14/21, 5:09:32 PM] AS: Hi Ari,
> Please see below side agreement which I think more appropriate and less complicated than the addendum.
> In the event that the manager of this project (Quality Inn Lake Charles)  is convicted of fraud in this deal, misappropriates funds, fails to maintain insurance, fails to pay taxes due, property is in default, filed asset for bankruptcy without notice and discussing with parties,  and is made aware of said short comings  and fails to remedy them within 10 business day or respond with a plan of action, investors shall have the right to remove the manager if the majority vote turns out in favor. Parties agree not seek removal or cause unnecessary aggravation to the manager in the event that property fails to preform beyond the managers capabilities,  for example overall market decline in sales, hurricane or storm, covid 19 etc....

21

Any discrepancy that may arise parties agree to sit down with an arbitrator that's experienced In business as an operator or attorney.

Manager reserves the right to reject a request for removal with written notice which can be challenged by investors by seeking arbitration where both parties will put their best foot forward and seek an amicable solution. [11/14/21, 5:09:40 PM] AS: I sent you in email too [11/14/21, 5:15:54 PM] Bodek: Ty [11/14/21, 9:30:52 PM] Bodek: Sent revised please review

112.        By email on Nov 15, 2021, Bodek sent to Stefansky:

Please see attached and  updated version below clarifying capital events. I think this is a wrap.
Hi Ari,
Please see below side agreement which I think more appropriate and less complicated than the addendum.
In the event that the manager of this project (Quality Inn Lake Charles)  is convicted of fraud in this deal, misappropriates funds, fails to maintain insurance, fails to pay taxes due, property is in default, filed asset for bankruptcy without notice and discussing with parties,  and is made aware of said short comings  and fails to remedy them within 10 business day or respond with a plan of action, investors shall have the right to remove the manager if the majority of members vote turns out in favor. Parties agree not to seek removal or cause unnecessary aggravation to the manager in the event that property fails to preform beyond the managers capabilities, for example overall market decline in sales, hurricane or storm, covid 19 etc….
Any discrepancy that may arise parties agree to sit down with an arbitrator that's experienced In business as an operator or attorney.
Manager reserves the right to reject a request for removal with written notice which can be challenged by investors by seeking arbitration where both parties will put their best foot forward and seek an amicable solution. Additionally manager agrees to include and discuss and seek approval on any major decisions,  mortgage, financing, refinancing, and or incurring any debt in excess of $25,000, the sale of property any acquisition of any real or personal property in addition to the Property, any construction major construction other than a Pip and renovations as planned, development or redevelopment of the Property, taking any major legal action legal action, termination or dissolution of the company.
Manager hereby clarifies that he will only receive a promote at a capital event once investors initial capital was returned in full and only then take a promote.

113.        Stefansky responded "As we discussed, Please print and sign. Ari."

114.        The Alphard Group investors did not receive any Prospectus, nor were they ever

informed whether or not the Membership Interests were registered securities pursuant to either the New Jersey Uniform Securities Law (1997) (N.J.S.A § 49:3-47 *et seq*), the federal Securities Act of 1933, 15 USCS § 77a *et seq*, or any other equivalent state law. Nor did they receive information that such securities were exempt from registration.

115. The Alphard Group received the attached financial models, attached as **Exhibit A** as of the following dates:

    a. 9/1/21, 3:16:48 PM: Copy of LC Hotel Model_v8.3 Final with Refi.xlsx
    b. 9/1/21, 5:13:30 PM: Copy of LC Hotel Updated 9-21 with refi accurate.xlsx
    c. 10/20/21, 6:29:03 PM: steph model draft.xlsx • 3 sheets
    d. 10/20/21, 6:29:57 PM: steph model draft.xlsx • 3 sheets
    e. 7/13/22, 8:47:48 PM: Spring Hill Lake Charles  Hotel .xlsx • 3 sheets
    f. 7/14/22, 11:39:45 AM: Spring Hill Lake Charles  Hotel updated.xlsx • 3 sheets

116. On December 7, 2021, by WhatsApp message and then by follow up phone, Bodek told Stefansky  that he needed him to sign a "Customer Information Form" from Celtic Bank, a copy of which is attached to this Complaint as **Exhibit B.** Bodek did not tell Stefansky, at any time, that he intended to name Alphard Group on the loan in any way. In the WhatsApp Conversation, he said "ca [sic] you please sign? Just goes on record . . . ."

117. Bodek then asked for urgent Business Statements from Z. Eisenbach's other businesses. Stefansky sent on December 9, 2021, two statements from Z. Eisenbach's business, Tompkins Associates Photo Saving LLC and Tompkins Associates Inc.

118. In mid-December 2021, without providing much explanation, Bodek asked Stefansky to accept back up to $300,000.00 from the title company, Riverside Abstract, and reissue such funds as checks to entities that he directed. He claimed that it was necessary for the closing. Stefansky trusted Bodek and issued such checks.

119. On January 5, 2022, Bodek informed the group about the closing.

120. In March 2023, Stefansky asked for updates, K1s, and reports.

121.    In September 2023, the Alphard Group decided to reorganize for tax purposes.  The Eisenbachs asked Bodek to reissue their shares, for their investments.  Zelig Eisenbach's shares were to be placed in Plaintiff ZE Estates LLC; Eli Eisenbach's shares were to remain in his own name.

122.    The Alphard Group participated in the September 2023 Capital Call in the total amount of $47,224.

123.    The Eisenbachs participated in the September 2023 Capital Call in the total amount of $20,967.60.

### F.  The Operating Agreements

124.    As set forth above, there are serious concerns with the "irregularities" found in the Operating Agreements that Bodek signed with the Investors, copies of which are attached to this Complaint as **Exhibit C:**

125.    For example, the Lelov Operating Agreement was full of errors.

   a.  It purported to be the "Amended and restated operating agreement", dated August 27, 2021, yet it stated that the company was formed in "August 24, 20201 [sic]". This date error is found in the Alphard, Halpert and ClearCut Glass Operating Agreements, but magically fixed in the Godinger Agreement.

   b.  Article 4 states that the Purpose of the Company was to " (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 4724 Round Lake Road, Indianapolis, Indiana (the "Property")."

   c.  The distributions in the Lelov Operating Agreement (Article 9) are different from all the other Operating Agreements.  In the Lelov Operating Agreement, it states

24

that:

> All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return on its Capital Contribution in accordance with each Member's Capital Percentage Interest and then (ii) to the Members in accordance with each Member's respective Capital Percentage Interest less a 30% promote (the "Promote") to the Manager till the return amounts to a total of 15% annual return, all distributions beyond the 15% shall be split 50% with manager which is set forth on Schedule A and defined in this Agreement as the "Ownership Percentage Interest".

    d.   Capital Events (Article 9) are treated differently in the Lelov Operating Agreement.

Distributions of capital on sale or refinance are in the Manager's discretion.

126.    However, the other Operating Agreements all treat distributions differently than the Lelov Agreement:

9.   <u>Distributions; Allocations</u>.

**Operating Income.** All available cash and other property available for distribution (if any) due to operating income (revenue from the Property less operating expenses, any loan payments and capital expenditures), shall be distributed to the Members from time to time, as determined by the Manager. All distributions shall be made on an annual basis in the following order of priority:

(i)   First, pro rata to the Members in accordance with each Member's respective Capital Percentage Interest until each Member shall have received an 8% annual return of such Member's Capital Contribution to the Company;

(ii)   Second, until each Member shall have received an aggregate annual return on such Member's Capital Contribution equal to 15% (inclusive of the 8% return under Section 9.a.(i) above), (A) 70% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 30% to the Manager in payment of the Manager's promote;

(iii)   Third, (A) 50% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 50% to the Manager in payment of the Manager's promote.

a.   **Capital Event.** All available cash and other property available for distribution (if any) due to a capital event (i.e. a sale or refinance of the Property), shall be distributed to the Members from time to time, as determined by the Manager, in the order of priority set forth in Section 9.a. above. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return on its Capital Contribution then outstanding in accordance with each Member's Capital Percentage Interest, and then (ii) to the Members, in return of each Member's aggregate Capital Contribution, pro-rata in accordance with each Member's respective Capital Percentage Interest, and then (iii) once all Member's Capital Contribution are reduced to $0.00, to the Members in accordance with each Member's Ownership Percentage Interest.

127.    The Alphard Operating Agreement likewise has a difference from the Halpert and ClearCut Glass Operating Agreements. Article 9 (i) states that distribution priority is made "First, pro rata to the Members in accordance with each Member's respective Capital Percentage Interest until each Member shall have received an 8% annual return _of_ such Member's Capital Contribution to the Company;" the Alphard Operating Agreement states "until each Member shall have received an 8% annual return _on_ such Member's Capital Contribution to the Company." Such difference is patently obvious as to the ramifications.

128.    Finally, the Operating Agreements, with regards to governance of Park Ave Capital III LLC, all state:

a.    Article 8 governs the daily management of the Company. It states:

Management of the Company. The business and affairs of the Company shall be managed by the Manager, who shall have the exclusive power and authority, on behalf of the Company, to take any action of any kind consistent with the provisions of this Agreement and the Act, and to do anything and everything it deems necessary or appropriate to carry on the business and purposes of the Company including but not limited to the right to sell, and/ or mortgage/finance the Company's assets without requiring the consent of the Member. The Manager shall have the exclusive power and authority to appoint an authorized signatory to execute any and all documents on behalf of the Company. The Manager is, to the extent of its rights and powers set forth in this Agreement and the Act, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

b.    Article 7 governs capital calls. On delivery of a proper Contribution Notice, specifying the total amount of the capital call, each Member's portion, and the proposed use. The Additional Capital Contribution required to be made by each Member shall equal the product obtained by multiplying the total Additional Capital Contribution by such Member's Capital Percentage Interest. Within 10

days after such notice, the Member must contribute its portion. If it fails, the Manager <u>may</u> send a second notice stating the shortfall, and the Member then has 5 days to cure. If the Member fails to cure, the Manager may then give a notice to the other Members , to contribute, on a pro-rata basis, based on their current Capital Percentage Interest. If the Members do not contribute, then at that point, any Member, together with the Manager, shall have the right to contribute towards all or part of the shortfall.

c.  Article 13 governs books and records. It states, in pertinent part, "(a) Complete and accurate books and accounts shall be kept and maintained for the Company at the Company's principal place of business or at such other place as the Manager shall select. . . . Each Member or such Member's duly authorized representative, at such Member's own expense and upon delivering advance written notice to the Company, shall at all reasonable times have access to, and may inspect and make copies of, such books and accounts and any other records of the Company."

d.  Article 14 states "<u>Title to Property</u>. Title to any property, real  or personal, owned by or leased to the Company <u>shall be held in the name of the Company</u>." (emphasis supplied).

e.  Article 15 states "<u>Exculpation; Liability of the Members and the Manager</u>. Neither of the Members nor the Manager shall have any liability for the obligations or liabilities of the Company, except to the extent otherwise expressly mandated by the Act. No Member or Manager shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Manager in good faith on behalf of the

Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Manager by this Agreement."

f.   Article 21 states "<u>Amendments</u>. This Agreement may be amended only by the written consent of the Members."

g.   Article 23 states "<u>Notices</u>. All notices and other communications to be given or to be served upon the Company, the Manager or a Member in connection with this Agreement must be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by telecopier with automatic confirmation of transmission or (iii) delivered by federal express or other reputable express delivery service; provided, in any case, that the same is directed to the intended recipient at the address specified for such intended recipient on Schedule A hereto, and, with respect to the Company and the Manager, at the address of the Company set forth in Section 1 of this Agreement. Any Member or the Company may, at any time, designate any other address in substitution of the foregoing address to which any such notice will be given."

129.   It is notable that the Operating Agreement does not include provisions on appointment and removal of the Manager. Therefore, <u>any</u> member could commence an action under 6 Del. C. § 18-110 to remove the manager.

### G.  <u>Timeline leading up to the Current Litigation</u>

130.   After the closing in January 2022, Bodek provided regular updates; however, as time went on, such updates became fewer and farther apart.

131.   Even when providing reports, Bodek mostly needed to be prompted first at least several times to provide standard reports.

132.     For example, on May 3, 2022, via WhatsApp, Zelig Eisenbach asked, "Pls send us report for first quarter when able   Thanks", to which Bodek replied, it will take time.

133.     Stefansky then followed up on June 12, 2022, via WhatsApp.

134.     Bodek finally shared a Profit and Loss Statement from 1/2022-5/2022, on June 29, 2022.  However, it was shared with the disclaimer that it wasn't complete.

135.     On August 9, 2022, Zelig Eisenbach sent a WhatsApp message to Bodek saying "Lazer, I think it's about time to get proper reports and updates, it's been over 9 months and we are totally in the dark. This has to stop". He followed up with a voice note pointing out that the June 29, 2022, Profit and Loss was never supplemented.

136.     On November 1, 2022, Zelig Eisenbach sent a WhatsApp message asking for a meeting to "see real numbers so we know exactly what's going on".  A meeting was scheduled and held on November 9, 2022.

137.     On January 17, 2023, Zelig Eisenbach sent a WhatsApp message saying, "It's been a year since closing we aren't getting barely anything from you, no updates no reports   Not good". Bodek responded and set up a call.

138.     On February 8, 2024, Bernfeld suggested to Bodek that he be more forthcoming with his reports, as stated before in ¶ 80.

139.     On February 22, 2023, Stefansky again asked for the annual reports, and the K1s.

140.     On March 21, 2023, Zelig Eisenbach again asked for the annual reports. On March 27, 2023, Bodek shared a comprehensive update via email. In that email, Bodek discussed the Q1 2023 distribution, which was the only distribution that was actually given.

141.     On May 10, 2023, Zelig Eisenbach again asked for reports.

142.     On June 23, 2023, Stefansky sent Bodek an email, copying Godinger, Rabinowitz,

and Eisenbach, stating:

> Hi Abe
> As we are nearing Q3 of 2023, and the 7th quarter since the
> beginning, we would like to have a sit down meeting to discuss
> and reflect on the state of this deal in exact detail.
> The agenda of the meeting is to cover the below topics
> 1) Detailed P&L by month since the beginning.
> 2) Budget & actual spent on construction with all details
> 3) Construction plan, completion plan and date.
> 4) Full 2022 detailed P&L
> 5) Refinance plan.
> 6) Next 4 quarter business plan.
> Please confirm that we can meet this coming Monday July 3rd at
> 5pm in Williamsburg @ 579 Flushing Ave.
> Please come prepared with all financials and documentations that
> you have, as each of us would like to get clarity on everything
> that's going on as you know we've been asking for reports from
> the get go and we never got anything sufficient. Our expectation is
> to exit this meeting with a clear understanding of where we stand.
> Please confirm.
> Thanks
> On behalf of all Ccd.

143.    Around January 17, 2024, via email, Stefansky and Eisenbach attempted to
schedule a meeting with Bodek.

144.    On February 20, 2024, Zelig Eisenbach asked for specific reports on occupancy
and revenue.

145.    On March 5, 2024, Stefansky asked "Can we please get an update how things are
going. Occupancy, revenue, avg rate, ……" to which Bodek responded, "absolutely, either tonight
or tomorrow I 'll send you a pulse on February."   Eisenbach responded "You love the word
tomorrow."

146.    Finally, on March 6, 2024, Bodek, via WhatsApp shared,

> As promised, February numbers.
> Gross revenue 117k
> Avrgae [sic] rate $90

> We had a fair bit of group business, which helped us achieve these numbers.
> We're getting a good response on customer traffic, but we're still underperforming the market.
> Group business is key right now, so we maintain cash flow.
> Also, keep in mind that we have ceased selling non renovated rooms to non groups so we can avoid negative reviews and bad reputation.

147.    Zelig Eisenbach then asked, "How is it compared to last year?"

Bodek responded, "We did 139k Feb last year.  We started losing traction later in the year as construction was scaling up."

148.    As stated previously in ¶ 54, Godinger asked for an accounting in February of 2024.

149.    On May 9, 2024, Godinger asked, via WhatsApp voice note, for April 2024 and May 2024 numbers. He then asked later that day again, when he received no response from Bodek. Bodek replied "I will send an email full breakdown"

150.    On May 15, 2024, when no reports were forthcoming, Godinger asked again for reports, saying that the other Investors were getting upset.

151.    In May of 2024, Stefansky met with Bodek, together with a non-party, Mr. Berkowitz.  After the meeting, Stefansky followed up with the following email:

> On Sun, May 26, 2024 at 8:14 PM Ari Stefansky
> <aristefansky@gmail.com> wrote:
> Hi Abe,
> As a follow up on your conversation with Mr. Berkowitz this past Thursday, regarding working together to pursue and seek another option for an operator. We appreciate your cooperation in this matter, thus ensuring that the project can prosper.
> We engaged with a reputable company to evaluate and pursue the option of them taking over operations. As a starter they requested the below items in order to evaluate this project.
> Please see the requested items below. It's important that you provide them immediately as we don't wanna lose time. Once they review the items, they would like to have a meeting with you thereafter in order to get the full picture.
> 1) 3 years P&l by month.

2) 3 years operating reports by month.
3) 3 years of STR reports by month.
Thank you for understanding,
On behalf of the investors.

On May 31, 2024, Stefansky followed up, with the following email:

> **From**: Ari Stefansky <aristefansky@gmail.com>
> **Sent**: Friday, May 31, 2024 1:47 PM
> **To**: Abe Bodek <Abe@evelopseo.com>
> **Cc**: M Bernfeld <mbbernfeld@gmail.com>; Meyer Godinger <M@silverspoons.com>; Ushi Rabinowitz <ushirabinowitz@gmail.com>; zelig eisenbach <zeligeisen@gmail.com>
> **Subject**: Re: The Marco
>
> Hi Abe,
>
> We are following up on a response to our previous email which we haven't received as of now.
> Based on your conversations with Leiby Berkowitz he mentioned your willingness to step aside as the operator if determined that it's needed for the success of this project.
> We are here to help and assist you in protecting and maximizing the asset, we share the same common goal, the goal is that this asset should prosper.
> In regards to the email you sent out this week, there is no mention nor discussion about seeking a new operator, and the requested reports were also not provided. As much as we are all hopeful, we still need to grasp what's going on and evaluate the situation.
> We will all gain from working this through together by applying the right solutions.
> Awaiting your response.
> On behalf of the investors.

152.    Bodek responded to the email, on June 3, 2024:

> Hi Ari,
> I am not sure I follow your last email.
> Whom are you representing in the email below?
> How and whom do you plan to bring in as an operator? You mentioned determining the need for a new operator as a deciding factor. Who will decide if a new operator is necessary? If we agree to replace the current operator, who will be the point person and person in charge? Who will be assuming responsibility on a day-to-day basis? Is that you?

32

What discussion are you seeking from me regarding replacing the
operator?
You mention the right solution, but I am not sure what that is. Do
you have a solution that I am unaware of? Can you please
articulate the solution?
I am just trying to understand what you want and how you see it
being implemented on a practical level.
Thanks
Abe

153.     On May 29, 2024, Bodek sent an email to the Investors with a copy of the 2024 Q1

PL and estimating that a cash call will be due of $145,000.00. A copy of the Cash Call emails is

attached as **Exhibit D.**

154.     In June of 2024, Stefansky and Eisenbach tried to arrange a meeting with Bodek.

155.     On June 17, 2024, Bodek sent an email to all Investors, stating that there was going

to be a Capital Call of $180,000.00

156.     On June 27, 2024, Bodek sent an email to Stefansky and Rabinowitz, with a

purported Cash Call in the amount of $33,568.  The purported reason was "This cash injection will

ensure that we can meet our operational needs and advance our project according to our planned

timelines. Please be prepared to make your respective contributions promptly. If you have any

questions or need further clarification, do not hesitate to reach out"

157.     On August 19, 2024, via counsel, the Investors sent a formal request for the Books

and Records of the Company to Bodek ("August 19 Accounting Demand"). A copy is attached as

**Exhibit E.** Specifically, the Investors asked:

My Clients therefore demand that you make available, no later than August 31, 2024 the following information, (collectively, the "Documents",) which my Clients are entitled to pursuant to 6 Del. C. § 18-305:

    (1) True and full information regarding the status of the business and financial condition of the Company as of August 15, 2024;

    (2) A copy of the Company's federal, state and local income tax returns for 2021, 2022 and 2023;

    (3) A current list of the name and last known business, residence or mailing address of each member and manager;

    (4) A copy of any written limited liability company agreement and certificate of formation and all amendments thereto, together with executed copies of any written powers of attorney pursuant to which the limited liability company agreement and any certificate and all amendments thereto have been executed. Considering that there are multiple differing versions of the operating agreement, in existence, which is greatly disturbing to the members to discover, they would like to verify the extent of such differences.

    (5) True and full information regarding the amount of cash and a description and statement of the agreed value of any other property or services contributed by each member and which each member has agreed to contribute in the future, and the date on which each became a member; and

    (6) Year to date (2024) monthly and quarterly financial statements, including but not limited to Cash Flow Statements, Income Statements and Balance Sheet Statements.

    (7) A copy of the latest STR report for the Property managed by the Company.

158.    The August 19 Accounting Demand also made it clear that the Capital Call would not be considered until such time as the Investors were provided with the records requested.

159.    Bodek never responded to the August 19 Accounting Demand.

160.    Godinger, in September 10-19, 2024, attempted to reconcile the accounting of the 2023 K1s with Bodek, but was not able to get straight answers.

161.    The Investors then called for a Special Meeting of the Members, to be held on September 25, 2024. A copy of the notice is attached as **Exhibit F**. All members, and Bodek were notified of the meeting

162.    The meeting was attended by Stefansky, Rabinowitz, Bernfeld, Herman, Schwartz, Halper, Meizels, Godinger, Eisenbach and Rother. At the meeting, it was decided that if Bodek did not comply within 30 days to the prior demands of the Members, the Members would issue a

summons either via Beth Din or Court to enforce their rights.

163.    After attempting to bring Defendant Bodek to arbitration before the Maysharim Rabbinical Court, see **Exhibit G**, Plaintiffs are forced to initiate this action to protect their rights.

### H.  The "Anomalies"

164.    Plaintiffs have been scratching their heads over the following anomalies, discovered during their quest for answers as to the Hotel Project, however, these questions only arose during the period starting the earlies, April 2024:

165.    Who owns Defendant Park Capital ACQ?

a.  Although the wiring instructions did state Defendant Park Capital ACQ as the account of the Buyer of the property, none of the Plaintiffs were ever informed of the existence, nature or relationship between Park Capital ACQ, LLC and Defendant Park Ave, the LLC of which they were buying membership interests. See **Exhibit H.**

b.  If there was, in fact an ownership relationship between Park Capital ACQ, LLC and Defendant Park Ave, such that Park Ave was the actual owner of Park Capital ACQ, it was never disclosed to any Investor.

c.  The K1s issued to each investor state Park Ave Capital III LLC as the "Partnership's Name".  See **Exhibit I.**

d.  The Operating Agreements all state Park Avenue Capital III LLC.

e.  In the purpose of the Operating Agreement, Section 4, it states "The sole business and purposes of the Company are to (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 401 N Lakeshore

Dr, Lake Charles, LA 70601." Therefore, any other purpose of the Company would thus be _ultra vires_.

f.  Park Capital ACQ LLC is a Louisiana Limited Liability Company, which, according to the Louisiana Secretary of State, is active and in good standing, has one Officer, ABRAHAM BODEK, whose Title is "Member", and whose Address is 426 HERBERTSVILLE RD, FL 3, BRICK, NJ 08724.  See **Exhibit J.**

g.  Park Ave. Capital III LLC, as of February 19, 2025, is in canceled status, because of failure to appoint a registered agent, as of May 9, 2024, which registered agent formally resigned April 4, 2024.  See **Exhibit J.**

h.  When previously asked for financials, Bodek issued financials with the heading of Park Capital ACQ LLC. See **Exhibit K.**

i.  The title of the Hotel Property is in the name of Park Capital ACQ LLC. The mortgage was taken out in the name of Park Capital ACQ LLC. See **Exhibit L.**

j.  Thus, the Investors have the right to demand an accounting to know who owns what.

166.    What was the series of transaction in December?

a.  Bodek solicited transactions that were suspicious in nature between Plaintiffs and the title company, asking for bank statements in December, that certainly give the impression that he was trying to create transactions for the purpose of closing on the mortgage.  See before, ¶¶ 46 - 50; 66 - 74; 90; 116 - 118.

b.  If this is true, then he unwittingly caused Plaintiffs to be part of a scheme of mortgage and bank fraud.

c.  He seems to have applied for, without any authorization to do so, a mortgage, in

the name of several of the Plaintiffs, including at least Mordechai Bernfeld.

167.    What is the percentage of ownership owned by the Plaintiffs?

a.    Plaintiff's initial capital contributions, and their percentages of ownership appear

below:

| LLC Name | Individual Names | Investment Amount | % Owne |
|---|---|---|---|
| LELOV INVESTMENTS LLC | Avrohom Meisels | $ 500,000.00 | 17.094% |
| Halpert Family Holdings LLC | Benzion Halpert | $ 500,000.00 | 17.094% |
| ClearCut Glass | Israel Schwartz, Aaron Herman, Mordechai Bernfeld | $ 225,000.00 | 7.692% |
| Alphard Group/ZE Estates | Zelig Eisenbach, Eli Eisenbach | $ 300,000.00 | 10.256% |
| BHYNY/Alphard Group | Aaron Stefansky, Osher Rabinowitz | $ 600,000.00 | 20.513% |
| A1 Management LLC (non-party) | Yoel Rother (non-party) | $ 500,000.00 | 17.094% |
| Hotel Lake Charles | Mayer Godinger | $ 300,000.00 | 10.256% |
| **Total** | | **2925000** | **100%** |

b.    According to the K1s, attached hereto as Exhibit I, however, the ownership

percentages are all over the place:

| LLC Name | Individual Names | K1 % of Ownership |
|---|---|---|
| LELOV INVESTMENTS LLC | Avrohom Meisels | 16% |
| Halpert Family Holdings LLC | Benzion Halpert | 16% |
| ClearCut Glass | Israel Schwartz, Aaron Herman, Mordechai Bernfeld | 6% |
| Alphard Group/ZE Estates | Zelig Eisenbach, Eli Eisenbach | 9% |
| BHY NY/Alphard Group | Aaron Stefansky, Osher Rabinowitz | 18% |
| A1 Management LLC (non-party) | Yoel Rother (non-party) | |
| Hotel Lake Charles | Mayer Godinger | 10.852% |

c.    The September 2023 Capital Call also did not follow any rhyme or reason – because

the numbers do not match either percentage.

i.    ClearCut Glass contributed $15,728 of September 2023 Capital Call amount

of $225,400, or 6.978%, which matches none of the percentages outlined

37

above.

    ii.   The Eisenbachs contributed $20,967.61, or 9.302%, again not matching any percentage above.

    iii.  BHY NY contributed $47,224, or 20.951%, again not matching any percentage above.

    iv.  Hotel Lake Charles contributed $20,967.61, or 9.302%, again not matching any percentage above. Moreover, Bodek told Bernfeld that his ownership percentage was 7.148%. See ¶ 76 above.

168.     Defendant Park Ave is a Delaware Company and is governed by Delaware law. See **Exhibit J.**

169.     6 Del. C. § 18-305 affords members access to "[t]rue and full information regarding the status of the business and financial condition of the limited liability company." 6 Del. C. § 18–305(a)(l).

170.     Thus, there was no way for Plaintiffs to put together the general scheme of the fraud until the Plaintiffs started to ask the hard questions and did not get any answers, which was when Defendant Bodek started to ignore Plaintiffs in April 2024.

171.     In addition, there was no way for Plaintiffs to understand some of these discrepancies until the K1s were issued. Some of the K1s were issued to Plaintiffs as late as May 2024, and in fact prompted further questions to Bodek.

172.     Plaintiffs have already suffered substantial harm and damages in the form of lost capital and profits, and the harm to Plaintiffs increases with each passing day. An accounting is necessary for Plaintiffs to even begin to understand what has happened to their investment. Once the accounting is completed, the Court can address the continuing harm that the Plaintiffs are

obviously suffering by the acts of Defendants.

## COUNT I
## COMPELLING PRODUCTION AND EXAMINATION OF INFORMATION AND RECORDS PURSUANT TO 6 DEL. C. §18-305 AND EQUITABLE ACCOUNTING

173.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

174.    Section 18–305(a) of the Delaware Limited Liability Company Act (the "DLLCA") affords members access to "[t]rue and full information regarding the status of the business and financial condition of the limited liability company." 6 Del. C. § 18–305(a)(l).

175.    The DLLCA also provides for copies of the tax returns; the LLC Operating Agreements; true and full information regarding the amount of cash; and other information regarding the affairs of the limited liability company as is just and reasonable. 6 Del. C. § 18–305(a)(2), (4), (5) and (6).

176.    Pursuant to 6 Del. C. § 18–305(e), the members have, on multiple occasions, in writing, requested such information from Defendants.

177.    On August 19, 2024, via written demand, the members made such demand, via notice.  Mr Bodek ignored such demands and has therefore breached the DLCCA.

178.    Although pursuant to 6 Del. C. § 18–305(f), the Delaware Chancery Court has exclusive jurisdiction for statutory accounting, Plaintiffs seek an equitable accounting, available under New Jersey law, where, such as here, there exists a fiduciary duty between Defendant as Manager and Plaintiffs as Member. *See Pine Bldg. Co. v. Grossman*, 102 N.J. Eq. 189, 191 (1928); *Fossa, Ltd. v. Lin*, No. 16-cv-11914-LTS, 2017 U.S. Dist. LEXIS 162258, at *26 (D. Mass. Sep. 29, 2017)

179.    There is a reasonable assumption that the Park Ave LLC does not exist, or never existed, as Defendants have allowed it to lapse; as such, forcing Plaintiffs to go to Delaware Chancery for a statutory accounting is inequitable.

180.    Because of Bodek's bad faith in failing to respond to the members demands, Plaintiffs are entitled to attorneys' fees and costs in this matter.

181.    Plaintiffs have no adequate remedy at law.


## COUNT II

## VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 OF THE SECURITIES AND EXCHANGE COMMISSION

182.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

183.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and  Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

184.    The Membership Interests are securities as the term is defined by 15 U.S.C. § 78c (10).

185.    Defendant Bodek used the means of interstate commerce to effectuate the frauds alleged herein, in that he used the Internet, traveled between New York and New Jersey, and used the interstate telecommunications system and mail system.

186.    Section 10(b) of the Securities Exchange Act, 15 U.S.C. § 78j(b) forbids the "use or employ[ment of] . . . any manipulative or deceptive device or contrivance," "in connection with the purchase or sale of any security," and "in contravention of [SEC] rules and regulations."

187.    SEC regulations forbid the making "of any untrue statement of a material fact or to omit or state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading" in connection with the purchase or sale of any security.

188.     Upon information and belief and as alleged above, Defendants knowingly made untrue, false and misleading statements of material fact and omitted to state material facts in order to make the statements made, in light of the circumstances under which they were made, not misleading to Plaintiffs, in connection with the sale of a security by Defendants to Plaintiffs.

189.     Pursuant to 15 USCS § 78u-4 b(b), Plaintiffs allege, upon information and belief, that the following statements, among many other statements made by Defendants, were untrue statements of material fact:

a.  That Defendant Bodek solicited investments, pursuant to operating agreements and membership interests issued under Defendant Park Ave Capital III LLC (Exhibit C), and such Operating Agreements specifically stated that the purposed of such investments were to purchase a hotel in Louisiana, but, as discovered only after piecing together the evidence that came to light later, Bodek in fact purchased such property under his own LLC, Defendant Park Cap ACQ, and fraudulently induced Plaintiffs to transfer the Investment to a shell company, Park Ave;

b.  That Bodek kept up the false premise of the scheme until today, by issuing K1s (Exhibit I) in the name of Park Ave Capital III LLC;

c.  That Bodek knew early on in soliciting the Investment that such investment was speculative at best, as the various models he shared with Plaintiffs show (Exhibit A), but failed to warn Plaintiffs of the nature and risk – rather, instead, he preyed on each of Plaintiff's specific vulnerabilities, such as personal relationships or language barriers, in order to mislead or misrepresent the nature of the investment;

d.  That Bodek solicited the Plaintiffs to provide bank statements and other supporting documents in order to induce Celtic Bank to underwrite and issue the Loan on the

Hotel Property, without informing any of the Plaintiffs of the fact that they may be held liable for the Loan, or that their personal information would be used to underwrite the loan, only using vague statements indicating that the documents were necessary to show "assets" or "for the closing".

190.    Bodek's actions were taken with knowledge of the falsity of his statements, and with knowledge that Plaintiffs would rely on the statements in order to evaluate the Investments and invest money into Defendant Park Ave.

191.    The purpose and effect of this conduct by Defendants was to induce Plaintiffs to invest over $2,400,000.00 in Park Ave.

192.    Specifically, Bodek's representations to Plaintiffs that, among other things:

a. investing in the Hotel Project would be profitable and prudent;
b. that the Property would be held by Park Ave when in fact it was purchased by Park CAP; and
c. Plaintiffs' interests were all adequately represented in the Operating Agreements, that were all the same, when in fact, there were significant differences between the Operating Agreements of each Investor;

were false, and Bodek knew at the time the statements were made to Plaintiffs that the statements were false. Such false statements as described above are reckless and materially misleading and in violation of both federal and state security laws.

193.    Defendants' misrepresentations and/or omissions were material to Plaintiffs, based both on Plaintiffs' investment objectives, expectations under the terms of the investment and Operating Agreements and as a matter of sound and prudent investment principles.

194.    But for Defendants misrepresentations and/or omissions, Plaintiff would not have invested with Defendants.

195.    Defendants' misrepresentations and/or omissions were material and misleading at the time they were made (or failed to be made) and were made knowingly, with reckless disregard

for their truth or falsity and/or without a genuine belief that the information disclosed was accurate and complete in all material respects.

196.    Plaintiffs have suffered damages, proximately caused by the wrongs alleged herein, in an amount to be proved at trial.

197.    This action is timely, since Plaintiffs only discovered the extent of Defendants' fraudulent misrepresentations only when Defendant started to refuse to provide information.  Only when Defendant Bodek refused to provide an accounting, did Plaintiffs start to review all the facts and dig into each relevant piece of the puzzle.

198.    When Plaintiffs put all the information together, during the period starting from April 2024 until September 2024, is the time when this action begins to accrue. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1325 (3d Cir. 2002).

199.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their acquisition of a security interest from the Defendants.

## COUNT III
## FALSE AND MISLEADING STATEMENTS PURSUANT TO THE NJUSA

200.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

201.    This Count is asserted against all Defendants and is based upon Section 49:3-71(a) of the New Jersey Uniform Securities Law, N.J.S.A. 49:3-71 (a).

202.    The membership interests are considered securities as defined under N.J.S.A. 49:3-

49(m); *Conroy v. Schultz*, 80 N.J. Super. 443, 445 (Super. Ct. 1963); *In re Eric J. Bruno & Mirakill Brands*, No. A-0967-19, 2021 N.J. Super. Unpub. LEXIS 488, at *4 (App. Div. Mar. 25, 2021).

203.    Defendants knowingly made untrue, false and misleading statements of material fact and omitted to state material facts in order to make the statements made, in the light of the circumstances under which they are made, not misleading (the buyer not knowing of the untruth or omission), in violation of N.J.S.A. 49:3-71 (a) (2).  Specifically, Bodek's representations to Plaintiffs that, among other things:

  d.   investing in the Hotel Project would be profitable and prudent;
  e.   that the Property would be held by Park Ave when in fact it was purchased by Park CAP; and
  f.   Plaintiffs' interests were all adequately represented in the Operating Agreements, that were all the same, when in fact, there were significant differences between the Operating Agreements of each Investor;

were false, and Bodek knew at the time the statements were made to Plaintiffs that the statements were false.

204.    Defendants also offered, sold, or purchased a security by employing any device, scheme, or artifice to defraud, in violation of N.J.S.A. § 49:3-71 (a) (3), by willfully falsifying bank documents supplied by Plaintiffs in order to obtain approval for a mortgage, to induce Plaintiffs to invest money with Defendants;

205.    Defendant also offered, sold or purchased a security by engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person, in violation of N.J.S.A. § 49:3-71 (a) (4), by purchasing the Hotel Property under the Park CAP company instead of under the Park Ave LLC.

206.    Defendant knew of the falsity of the statements being made and intended to deceive Plaintiffs.

207.    Plaintiffs were induced into investing over $2,400,000.00 into Park Ave.  Upon

information and belief, Park Cap is in default of its mortgage, and Plaintiffs are at risk of losing all of their investments.

208.    This action is timely, since Plaintiffs only discovered the extent of Defendants' fraudulent misrepresentations only when Defendant started to refuse to provide information.  Only when Defendant Bodek refused to provide an accounting, did Plaintiffs start to review all the facts and dig into each relevant piece of the puzzle.

209.    When Plaintiffs put all the information together, during the period starting from April 2024 until September 2024, is the time when this action begins to accrue. . *Roll v. Singh*, Civil Action No. 07-cv-04136 (FLW), 2008 U.S. Dist. LEXIS 50125, at *52 (D.N.J. June 26, 2008)

210.    Plaintiffs have suffered damages, proximately caused by the wrongs alleged herein, in an amount to be proved at trial.

211.    By reason of the foregoing, Defendants violated Section 49:3-71 (a) of the New Jersey Uniform Securities Law in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon Plaintiffs in connection with their acquisition of a security interest from the Defendants.

## COUNT IV
## FRAUDULENT INDUCEMENT

212.    Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

213.    Bodek, by acts of both omission and commission, made false statements to

Plaintiffs concerning material facts about their investments.

214.     Specifically, Bodek's representations to Plaintiffs that, among other things:

    a.  investing in the Hotel Project would be profitable and prudent;

    b.  that the Property would be held by Park Ave when in fact it was purchased by Park CAP and

    c.  Plaintiffs' interests were all adequately represented in the Operating Agreements, that were all the same, when in fact, there were significant differences between the Operating Agreements of each Investor

were false, and Bodek knew at the time the statements were made to Plaintiffs that the statements were false.

215.     Bodek intended that Plaintiffs would be induced into action by relying upon the statements of fact he made to Plaintiffs.

216.     In the course of investing their funds with Park Ave and entrusting the Defendants to properly handle their investments, Plaintiffs reasonably and justifiably relied on the statements of fact made to them by Bodek.

217.     As a direct and proximate result of Plaintiffs' reliance on the statements made to them by Bodek, Plaintiffs have suffered damage.

## COUNT V
## FRAUD

218.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

219.      Bodek, by acts of both omission and commission, made false statements to Plaintiffs concerning material facts regarding the mortgage with Celtic Bank underwritten by the SBA.

220.      Specifically, Bodek requested from Plaintiffs to supply bank statements,

Customer Information Forms and bank screen shots, telling Plaintiffs that such documents were being requested by the bank as support, but not telling Plaintiffs that he was cosigning some or all of Plaintiffs on the mortgage.:

221.     These misrepresentations were material, because a reasonable person would attach importance to sharing their information with a bank to apply for a mortgage.

222.     Bodek's statements regarding the use of the documents were false, and Bodek knew at the time the statements were made to Plaintiffs that the statements were false.

223.     Bodek intended that Plaintiffs would be induced into action by relying upon the statements of fact he made to Plaintiffs.

224.     Because of the fact that some or all of the Plaintiffs are cosigned on the mortgage, they are now liable for the mortgage.

225.     As a direct and proximate result of Plaintiffs' reliance on the statements made to them by Bodek, Plaintiffs have suffered damage.


**COUNT VI**
**BREACH OF FIDUCIARY DUTY**

226.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

227.     Plaintiffs and Bodek shared a relationship whereby:

228.     Plaintiffs reposed trust and confidence in Bodek, and

229.     Bodek undertook such trust and assumed a duty to advise, counsel and/or protect Plaintiffs.

230.     Bodek owed Plaintiffs a fiduciary duty to, among other things:

231.     disclose to Plaintiffs all material information pertaining to Plaintiffs' investments in Park Ave;

232.     refrain from making false statements or creating misimpressions of material fact as they relate to Plaintiffs' investments in Park Ave;

233.     refrain from self-dealing; and

234.     reveal to Plaintiffs all legal conflicts of interest that might negatively impact Bodek's ability to fully and fairly represent Plaintiffs' legal interests in connection with their investments in Park Ave.

235.     Bodek breached his duty to Plaintiffs.

236.     As a direct and proximate result of Bodek's breach of his duties, Plaintiffs have suffered damage.

## COUNT VII
## NEGLIGENT MISREPRESENTATION

237.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

238.      Bodek's misrepresentations and false promises were material to Plaintiffs, who reasonably relied upon those representations and promises.

239.      Plaintiffs would not have agreed to invest their funds with Park Ave if they had known that the investment was not as secure as represented by Bodek and was actually a fraudulent scheme; and Plaintiffs would not have lost approximately $2,400,000.00.

240.      Bodek intended that Plaintiffs rely on his representations and promises, as he knew that Plaintiffs would not entrust their investment funds to unreasonable risks of loss.

241.      In reliance upon Bodek's representations and promises, Plaintiffs invested their funds with Park Ave.

242.      As a direct and proximate result of Bodek's wrongful actions, Plaintiffs have been damaged.

## COUNT VIII
## IMPOSITION OF A CONSTRUCTIVE TRUST AND DISGORGEMENT OF FUNDS

243.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

244.     Park Ave and Park CAP each owe fiduciary duties to their stakeholders which -- by virtue of their investments -- includes Plaintiffs.

245.     This is an action to impose a constructive trust upon the Property taken from Plaintiffs that is currently held by Park Ave and Park CAP. This action further calls for the restoration to Plaintiffs of that wrongfully obtained property.

246.     As set forth above, Park Ave and Park CAP, through actual fraud, abuse of confidence, or other questionable means – have obtained Plaintiffs' investment funds, to purchase the Property located at 401 N Lakeshore Dr, Lake Charles, LA, known as the Marco Hotel, which in equity and good conscience they should no longer be permitted to hold.

247.     The assets at issue are specific, identifiable property and can be traced in assets of Park Ave and Park CAP.

248.     Any such assets currently held by Park Ave and Park CAP must be disgorged to Plaintiffs' benefit, as Park Ave and Park CAP are not entitled to the benefit of the wrongfully misappropriated and converted funds invested by Plaintiffs.


## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests the following relief to be further specified in an order by the Court:

I.     A full accounting of the Defendants' records;

II.     Imposition of a constructive trust and disgorgement of funds;

III.     an accounting of the monies obtained through these wrongful acts;

IV.    disgorgement of the investment monies obtained through these wrongful acts;

V.    lost profits;

VI.    compensatory damages;

VII.    punitive damages;

VIII.    attorney's fees;

IX.    costs; and

X.    such other and further relief as this Court may deem proper.


Dated: Lakewood, New Jersey
        February 26, 2024

Respectfully Submitted,


By: <u>s/ Mordy Gross</u>
Mordy Gross, Esq.
Bar No.: 016802009
**Law Offices of Mordy Gross, LLP**
221 Pine St.,
Lakewood, NJ 08701
(P) 484.680.0768
mg@mordygross.com
Attorney for Plaintiffs

**Verification Pursuant to Local Rule 11.2**

Pursuant to Local Rule 11.2, the undersigned counsel verifies that this matter in controversy is

not the subject of any other action pending in any court, or of any pending arbitration or

administrative proceeding.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United

States of America that the foregoing is true and correct.

Dated: Lakewood, New Jersey
      February 26, 2024

                                    By: <u>s/ Mordy Gross</u>
                                    Mordy Gross, Esq.
                                    Bar No.: 016802009
                                    **Law Offices of Mordy Gross, LLP**
                                    221 Pine St.,
                                    Lakewood, NJ 08701
                                    (P) 484.680.0768
                                    mg@mordygross.com
                                    Attorney for Plaintiffs