# Exhibit C – Operating Agreements shared with Investors

## AMENDED AND RESTATED OPERATING AGREEMENT
### OF Park Ave Capital III LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of, a Delaware limited liability company (the "Company") is dated as of January, 2023, between the Manager (as defined below) and all of the parties who sign copies of this Agreement as members of the Company (collectively referred to herein as the "Members" and individually as a "Member").

## W I T N E S S E T H:

WHEREAS, the Company was formed as a Delaware limited liability company under the name "Park Ave Capital III LLC", on August 24, 2021 by the filing of its Certificate of Formation (the "Certificate") with the Secretary of State of the State of Delaware, in accordance with the Limited Liability Company Act of the State of Delaware, as amended (the "Act"); and

WHEREAS, the Members desire to invest certain sums in the Company, as delineated on Schedule A; and

WHEREAS, some of the Members will receive Ownership Percentage Interests (as hereinafter defined) which are not in accordance with their Capital Percentage Interests (as hereinafter defined) as (the "Manager") is receiving a Promote (as hereinafter defined) on certain Members' Ownership Percentage Interests; and

WHEREAS, the Members desire to enter into this Agreement in order to state the terms and conditions of the ownership, operation and management of the Company.

NOW, THEREFORE, in consideration of the promises and the agreements herein contained and intending to be legally bound hereby, the Members hereby agree as follows:

1. <u>Name; Office</u>.  The name of the Company is  Park Ave Capital III LLC, The principal place of business for the Company is, or at such other place or places as the Manager may from time to time designate.

2. <u>Registered Office/Registered Agent</u>.  The address of the registered office of the Company and registered agent of the Company for service of process shall be as designated in the Certificate or any amendment thereof. The registered office and the registered agent may be changed from time to time by the Manager in accordance with the Act.

3. <u>Certificates</u>.  The Manager may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

<u>Purpose</u>.  The sole business and purposes of the Company are to (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 401 N Lakeshore Dr, Lake Charles, LA 70601.

4. (the "Property"), and (ii) do any and all other acts or things that may be necessary or incidental to carry on the business activities of the Company in connection therewith as permitted under the Act.

5.    <u>Term</u>.  The term of the Company began as of the date of the filing of the Certificate and shall end on such date as determined by Manager or applicable law.

6.    <u>Capital Contribution</u>.    "Capital Contribution" or "Initial Capital Contribution" shall mean the aggregate net amount of immediately available funds contributed to the Company by a Member.  Simultaneously with the execution of this Agreement, each Member shall make an initial Capital Contribution to the Company in the amount set forth opposite each such Member's name on Schedule A attached hereto.

7.    <u>Additional Contributions</u>.  (i) Each Member shall be obligated to make additional capital contributions (each an "Additional Capital Contribution") as are called for by the Manager (an "Additional Capital Notice").  Additional Capital Contributions shall be made by each Member in accordance with its Capital Percentage Interest as indicated on Schedule A) and shall be made within ten (10) days following the date of the Additional Capital Notice.  The Manager shall do so by delivering to each Member a notice (a "Contribution Notice") specifying: (x) the total amount of the Additional Capital Contribution; (y) each Member's portion of the Additional Capital Contribution (a "Contribution Portion"); and (z) the proposed use of the requested funds.  The Additional Capital Contribution required to be made by each Member shall equal the product obtained by multiplying the total Additional Capital Contribution by such Member's Capital Percentage Interest.

(ii)    Within ten (10) days after the date of the giving of the Contribution Notice, each Member shall contribute to the Company its respective Contribution Portion.  A Member who does so contribute is referred to herein as a "Contributing Member".  If any Member shall fail to contribute all or any portion of its required Contribution Portion within the applicable period of time (a "Declining Member"), then the Manager may send a second notice to the Declining Member stating the amount of the Declining Member's shortfall (the "Shortfall Amount"). If such Declining Member fails to contribute such Shortfall Amount within five (5) days after such notice, the Manager may give notice thereof to all Members (the "Shortfall Notice"), which Shortfall Notice shall offer to each Contributing Member an opportunity to contribute to the Company all or a portion of the Shortfall Amount.  If there are two or more Contributing Members which desire to fund in accordance with the Shortfall Notice, each Contributing Member shall have the right, exercisable within five (5) days after the giving of the Shortfall Notice, to contribute to the Company an amount equal to their Capital Percentage Interest of the Shortfall Amount.  In the event that the Contributing Members do not, in response to the Shortfall Notice, contribute to the Company the entire amount of the Shortfall Amount, then any of the Contributing Members who contributed toward the Shortfall Amount, together with the Manager shall have the right to contribute all or any portions of such remaining Shortfall Amount to the Company.  Each contribution by a Contributing Member of a Shortfall Amount is referred to herein as "Default Capital Contribution" (it being understood that Default Capital Contributions shall also include capital contributions designated elsewhere in the Operating Agreement as Default Capital Contributions).

(iii)    A Contributing Member may elect, within ten (10) days of the making of a Default Capital Contribution, to have its Default Capital Contribution treated as a loan by the Contributing Member to the Declining Member (each a "Default Loan"); each such loan shall bear interest at a rate of eighteen percent (18%) per annum, al pi Heter Iska.

(iv)    If  a Contributing Member shall (1) not have timely elected to have its Default Capital Contribution as a Default Loan, or (2) at any time (but following ten (10) days

written notice to repay from the Contributing Member to the Declining Member) elect to covert its Default Loan to Default Capital Contribution, then the Declining Member's Capital Percentage Interest and Ownership Percentage Interest, as applicable, shall be reduced by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by Contributing Members and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. The Capital Percentage Interest and Ownership Percentage Interest, as applicable, of each Contributing Member making a Default Capital Contribution shall be increased by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by such Contributing Member and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. (Upon the occurrence of the cram-down herein set forth, any balance due in respect of the applicable Default Loan that was converted into an equity interest shall be deemed repaid).

(v)    Any such increase in the Contributing Member's Capital Percentage Interest and Ownership Percentage Interest and reduction in the Declining Member's Capital Percentage Interest and Ownership Percentage Interest in the Company shall be treated for Federal income tax purposes as a sale of the Percentage Interest from the Declining Member to the Contributing Member in consideration for the cancellation of the Declining Member's obligation to repay the capital advanced by the Contributing Member on behalf of the Non-Contributing Member.

(vi)    The Declining Member shall, at the request of a Contributing Member, execute and deliver such amendments to this Agreement as the Contributing Member may reasonably request to reflect the adjustments pursuant to this Section. Such certification or amendments, however, shall not be required to give force or effect to this Section. In the event Declining Member fails to execute such documents, Manager is hereby appointed as power of attorney, coupled with an interest to execute such documents.

(vii)    Any Default Loan and interest due thereon shall be deemed recourse to the Declining Member and, in addition to all rights and remedies, shall repaid from distributions otherwise payable to the Declining Member (though such distributions shall have been deemed distributed to the Declining Member) for tax purposes.

(viii)    Notwithstanding anything contained in this Section 7, the Manager shall have no obligation to make any Additional Capital Contributions; however, the Manager may be a Contributing Member in the event there is a Declining Member.

8.    <u>Management of the Company</u>.    The business and affairs of the Company shall be managed by the Manager, who shall have the exclusive power and authority, on behalf of the Company, to take any action of any kind consistent with the provisions of this Agreement and the Act, and to do anything and everything it deems necessary or appropriate to carry on the business and purposes of the Company including but not limited to the right to sell, and/ or mortgage/finance the Company's assets without requiring the consent of the Member. The Manager shall have the exclusive power and authority to appoint an authorized signatory to execute any and all documents on behalf of the Company. The Manager is, to the extent of its rights and powers set forth in this Agreement and the Act, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

9.  <u>Distributions; Allocations</u>.

.  **Operating Income.** All available cash and other property available for distribution (if any) due to operating income (revenue from the Property less operating expenses, any loan payments and capital expenditures), shall be distributed to the Members from time to time, as determined by the Manager.  All distributions shall be made on an annual basis in the following order of priority:

(i)  First, pro rata to the Members in accordance with each Member's respective Capital Percentage Interest until each Member shall have received an 8% annual return of such Member's Capital Contribution to the Company;

(ii)  Second, until each Member shall have received an aggregate annual return on such Member's Capital Contribution equal to 15% (inclusive of the 8% return under Section 9.a.(i) above), (A) 70% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 30% to the Manager in payment of the Manager's promote;

(iii)  Third, (A) 50% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 50% to the Manager in payment of the Manager's promote.

a.  .  **Capital Event.** All available cash and other property available for distribution (if any) due to a capital event (i.e. a sale or refinance of the Property), shall be distributed to the Members from time to time, as determined by the Manager, in the order of priority set forth in Section 9.a. above. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return  on its Capital Contribution then outstanding in accordance with each Member's Capital Percentage Interest, and then (ii) to the Members, in return of each Member's aggregate Capital Contribution, pro-rata in accordance with each Member's respective Capital Percentage Interest, and then (iii) once all Member's Capital Contribution are reduced to $0.00, to the Members in accordance with each Member's Ownership Percentage Interest.

b.  The Members shall not receive out of Company property any part of their Capital Contributions until all liabilities of the Company (if any) have been paid or there remains property of the Company sufficient to pay them. All items of Company profit, loss, gain, deduction and credit shall be allocated among the Members pro rata, in proportion to their respective Ownership Percentage Interests.

c.  The Members agree and acknowledge that in consideration for the ability to invest in the Company, the Members will pay the Promote to the Manager, which Promote shall reduce their Capital Percentage Interest by the Promote amount to the Ownership Capital Interest.

10.  <u>Tax; Tax Elections</u>.  The Company shall maintain a capital account for each of the Members in accordance with the rules set forth in Treas. Reg. § 1.704-1 and 1.704-2.  Any elections required or permitted to be made by the Company under the Internal Revenue Code of 1986, as amended, (the "<u>Code</u>") shall be made by the Manager in such manner as the Manager

shall determine.  In the event of an audit of the Company by the Internal Revenue Service, the Manager shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and shall comply with all of its obligations as such under the Code and the regulations promulgated thereunder.

11.     <u>Transfers; Additional Members</u>.  Except as expressly set forth in this Section 11, no Member may sell, convey, assign, encumber or otherwise transfer (collectively, "<u>Transfer</u>") its Ownership Percentage Interest or Capital Percentage Interest or any part thereof, without the prior written consent of the Manager; <u>provided</u> <u>however</u>, that a Member shall have the right to make the following transfers without the consent of the Manager:  (a) a transfer by will or intestacy and (b) a transfer to any parent, child, spouse, grandchild or sibling of such Member or any trust for the benefit of any such individual.  No person or entity may become an additional Member without the prior written consent of the Manager, except that any person or entity that is a transferee of an interest as a result of a Transfer permitted hereunder may become a Member without such consent.  Notwithstanding the foregoing, no transferee or additional Member shall become a Member until it shall have executed and delivered to the Manager an agreement in which such transferee or additional Member assumes and agrees to be bound by all of the terms and conditions of this Agreement.

12.     <u>Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up in accordance with the Act upon the earlier to occur of: (i) the written action of dissolution taken by the Manager; or (ii) upon any event or action causing dissolution of the Company as specified in the Act.  Upon dissolution, the Company shall not be terminated and shall continue in effect until a certificate of dissolution or its equivalent has been issued by the Secretary of State of Delaware.

13.     <u>Maintenance of Books and Records; Accounts</u>.

(a)     Complete and accurate books and accounts shall be kept and maintained for the Company at the Company's principal place of business or at such other place as the Manager shall select.  Such books and accounts shall be kept for fiscal and tax purposes on the cash or accrual basis, as the Manager shall determine, and shall include separate accounts for each Member.  A list of the names and addresses of the Members shall be maintained as part of the books and records of the Company.  Each Member or such Member's duly authorized representative, at such Member's own expense and upon delivering advance written notice to the Company, shall at all reasonable times have access to, and may inspect and make copies of, such books and accounts and any other records of the Company.

(b)     All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Manager may designate from time to time, and withdrawals therefrom shall be made upon the signature, on behalf of the Company, as the Manager may designate from time to time.  In the sole and absolute discretion of the Manager, all deposits and other funds not needed in the operation of the Company's business may be deposited in interest-bearing bank accounts, in money market funds, or invested in treasury bills, certificates of deposit, U.S. government security-backed repurchase agreements or similar short-term money market instruments, or funds investing in any of the foregoing or similar types of short-term investments.

14.     <u>Title to Property</u>.  Title to any property, real or personal, owned by or leased to the Company shall be held in the name of the Company.

15.     <u>Exculpation; Liability of the Members and the Manager</u>.  Neither of the Members nor the Manager shall have any liability for the obligations or liabilities of the Company, except to the extent otherwise expressly mandated by the Act.  No Member or Manager shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Manager by this Agreement.

16.     <u>Benefits of Agreement</u>.  None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of the Company or by any person other than the Manager or a party to this Agreement and its permitted successors and assigns (subject to the express provisions of Section 11 of this Agreement).

17.     <u>Indemnification</u>.  The Company, or its receiver or trustee, shall pay all judgments and claims asserted by anyone (a "<u>Claimant</u>") against, and shall indemnify and save harmless, the Manager from, any liability or damage to a Claimant incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including, without limitation, reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, including all such liabilities under the Act.

18.     <u>Engaging In Other Activities</u>.  Notwithstanding any provision contained in this Agreement to the contrary, any Member or the Manager may engage in, invest in, participate in or otherwise enter into other business ventures of any kind, nature and description, alone or with others, including, without limitation, the acquisition, ownership, financing, leasing, operation, management or development of any interests in any business or asset, and the Company shall not have any right in or to any such activities or the income or profits derived therefrom.

19.     <u>Reimbursement of Expenses</u>.  The Company shall reimburse the Manager for reasonable business expenses incurred in connection with the Manager's activities conducted on behalf of the Company.

20.     <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

21.     <u>Amendments</u>.  This Agreement may be amended only by the written consent of the Members.

22.     <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties hereto pertaining to its subject matter.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

23.     <u>Notices</u>.  All notices and other communications to be given or to be served upon the Company, the Manager or a Member in connection with this Agreement must be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by telecopier with automatic confirmation of transmission or (iii) delivered by federal express or other reputable express delivery service; provided, in any case, that the same is directed to the intended recipient at the address specified for such intended recipient on <u>Schedule A</u> hereto, and, with respect to the

Company and the Manager, at the address of the Company set forth in Section 1 of this Agreement. Any Member or the Company may, at any time, designate any other address in substitution of the foregoing address to which any such notice will be given.

24.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The undersigned Member acknowledges receipt of this Agreement which has not been signed by the other Members.

IN WITNESS WHEREOF, the undersigned, by executing this signature page, hereby adopts and agrees to all the terms, conditions and representations contained in this Operating Agreement of which this signature page is a part of.

**MEMBER:**

_____

**By:**

**Address:**
**SS#/ EIN:**

**Manager for: Park Ave Capital III LLC:**

_____

**By: A Bodek**

**Schedule A**

| Member | Address | Capital Contribution | Capital Percentage Interest | Ownership Percentage Interest |
|---|---|---|---|---|
| Meyer Godinger | 164 Rodney street Brooklyn, NY 11211 | $300,000 | **8.5%** | |

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF Park Ave Capital III LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of, a Delaware limited liability company (the "Company") is dated as of August 27, 2021, between the Manager (as defined below) and all of the parties who sign copies of this Agreement as members of the Company (collectively referred to herein as the "Members" and individually as a "Member").

## W I T N E S S E T H:

WHEREAS, the Company was formed as a Delaware limited liability company under the name "Park Ave Capital III LLC", on August 24, 20201 by the filing of its Certificate of Formation (the "Certificate") with the Secretary of State of the State of Delaware, in accordance with the Limited Liability Company Act of the State of Delaware, as amended (the "Act"); and

WHEREAS, the Members desire to invest certain sums in the Company, as delineated on Schedule A; and

WHEREAS, some of the Members will receive Ownership Percentage Interests (as hereinafter defined) which are not in accordance with their Capital Percentage Interests (as hereinafter defined) as (the "Manager") is receiving a Promote (as hereinafter defined) on certain Members' Ownership Percentage Interests; and

WHEREAS, the Members desire to enter into this Agreement in order to state the terms and conditions of the ownership, operation and management of the Company.

NOW, THEREFORE, in consideration of the promises and the agreements herein contained and intending to be legally bound hereby, the Members hereby agree as follows:

    1.   Name; Office.  The name of the Company is  Park Ave Capital III LLC, The principal place of business for the Company is, or at such other place or places as the Manager may from time to time designate.

    2.   Registered Office/Registered Agent.  The address of the registered office of the Company and registered agent of the Company for service of process shall be as designated in the Certificate or any amendment thereof. The registered office and the registered agent may be changed from time to time by the Manager in accordance with the Act.

    3.   Certificates.  The Manager may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

Purpose.  The sole business and purposes of the Company are to (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 401 N Lakeshore Dr, Lake Charles, LA 70601.

    4.   (the "Property"), and (ii) do any and all other acts or things that may be necessary or incidental to carry on the business activities of the Company in connection therewith as permitted under the Act.

5.    <u>Term</u>.  The term of the Company began as of the date of the filing of the Certificate and shall end on such date as determined by Manager or applicable law.

6.    <u>Capital Contribution</u>.    "Capital Contribution" or "Initial Capital Contribution" shall mean the aggregate net amount of immediately available funds contributed to the Company by a Member.  Simultaneously with the execution of this Agreement, each Member shall make an initial Capital Contribution to the Company in the amount set forth opposite each such Member's name on Schedule A attached hereto.

7.    <u>Additional Contributions</u>.  (i) Each Member shall be obligated to make additional capital contributions (each an "Additional Capital Contribution") as are called for by the Manager (an "Additional Capital Notice").  Additional Capital Contributions shall be made by each Member in accordance with its Capital Percentage Interest as indicated on Schedule A) and shall be made within ten (10) days following the date of the Additional Capital Notice.  The Manager shall do so by delivering to each Member a notice (a "Contribution Notice") specifying: (x) the total amount of the Additional Capital Contribution; (y) each Member's portion of the Additional Capital Contribution (a "Contribution Portion"); and (z) the proposed use of the requested funds.  The Additional Capital Contribution required to be made by each Member shall equal the product obtained by multiplying the total Additional Capital Contribution by such Member's Capital Percentage Interest.

(ii)    Within ten (10) days after the date of the giving of the Contribution Notice, each Member shall contribute to the Company its respective Contribution Portion.  A Member who does so contribute is referred to herein as a "Contributing Member".  If any Member shall fail to contribute all or any portion of its required Contribution Portion within the applicable period of time (a "Declining Member"), then the Manager may send a second notice to the Declining Member stating the amount of the Declining Member's shortfall (the "Shortfall Amount"). If such Declining Member fails to contribute such Shortfall Amount within five (5) days after such notice, the Manager may give notice thereof to all Members (the "Shortfall Notice"), which Shortfall Notice shall offer to each Contributing Member an opportunity to contribute to the Company all or a portion of the Shortfall Amount.  If there are two or more Contributing Members which desire to fund in accordance with the Shortfall Notice, each Contributing Member shall have the right, exercisable within five (5) days after the giving of the Shortfall Notice, to contribute to the Company an amount equal to their Capital Percentage Interest of the Shortfall Amount.  In the event that the Contributing Members do not, in response to the Shortfall Notice, contribute to the Company the entire amount of the Shortfall Amount, then any of the Contributing Members who contributed toward the Shortfall Amount, together with the Manager shall have the right to contribute all or any portions of such remaining Shortfall Amount to the Company.  Each contribution by a Contributing Member of a Shortfall Amount is referred to herein as "Default Capital Contribution" (it being understood that Default Capital Contributions shall also include capital contributions designated elsewhere in the Operating Agreement as Default Capital Contributions).

(iii)    A Contributing Member may elect, within ten (10) days of the making of a Default Capital Contribution, to have its Default Capital Contribution treated as a loan by the Contributing Member to the Declining Member (each a "Default Loan"); each such loan shall bear interest at a rate of eighteen percent (18%) per annum, al pi Heter Iska.

(iv)    If  a Contributing Member shall (1) not have timely elected to have its Default Capital Contribution as a Default Loan, or (2) at any time (but following ten (10) days

written notice to repay from the Contributing Member to the Declining Member) elect to covert its Default Loan to Default Capital Contribution, then the Declining Member's Capital Percentage Interest and Ownership Percentage Interest, as applicable, shall be reduced by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by Contributing Members and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. The Capital Percentage Interest and Ownership Percentage Interest, as applicable, of each Contributing Member making a Default Capital Contribution shall be increased by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by such Contributing Member and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. (Upon the occurrence of the cram-down herein set forth, any balance due in respect of the applicable Default Loan that was converted into an equity interest shall be deemed repaid).

(v) Any such increase in the Contributing Member's Capital Percentage Interest and Ownership Percentage Interest and reduction in the Declining Member's Capital Percentage Interest and Ownership Percentage Interest in the Company shall be treated for Federal income tax purposes as a sale of the Percentage Interest from the Declining Member to the Contributing Member in consideration for the cancellation of the Declining Member's obligation to repay the capital advanced by the Contributing Member on behalf of the Non-Contributing Member.

(vi) The Declining Member shall, at the request of a Contributing Member, execute and deliver such amendments to this Agreement as the Contributing Member may reasonably request to reflect the adjustments pursuant to this Section. Such certification or amendments, however, shall not be required to give force or effect to this Section. In the event Declining Member fails to execute such documents, Manager is hereby appointed as power of attorney, coupled with an interest to execute such documents.

(vii) Any Default Loan and interest due thereon shall be deemed recourse to the Declining Member and, in addition to all rights and remedies, shall repaid from distributions otherwise payable to the Declining Member (though such distributions shall have been deemed distributed to the Declining Member) for tax purposes.

(viii) Notwithstanding anything contained in this Section 7, the Manager shall have no obligation to make any Additional Capital Contributions; however, the Manager may be a Contributing Member in the event there is a Declining Member.

8. <u>Management of the Company</u>. The business and affairs of the Company shall be managed by the Manager, who shall have the exclusive power and authority, on behalf of the Company, to take any action of any kind consistent with the provisions of this Agreement and the Act, and to do anything and everything it deems necessary or appropriate to carry on the business and purposes of the Company including but not limited to the right to sell, and/ or mortgage/finance the Company's assets without requiring the consent of the Member. The Manager shall have the exclusive power and authority to appoint an authorized signatory to execute any and all documents on behalf of the Company. The Manager is, to the extent of its rights and powers set forth in this Agreement and the Act, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

9.    <u>Distributions; Allocations.</u>

.    **Operating Income.** All available cash and other property available for distribution (if any) due to operating income (revenue from the Property less operating expenses, any loan payments and capital expenditures), shall be distributed to the Members from time to time, as determined by the Manager.  All distributions shall be made on an annual basis in the following order of priority:

(i)    First, pro rata to the Members in accordance with each Member's respective Capital Percentage Interest until each Member shall have received an 8% annual return of such Member's Capital Contribution to the Company;

(ii)    Second, until each Member shall have received an aggregate annual return on such Member's Capital Contribution equal to 15% (inclusive of the 8% return under Section 9.a.(i) above), (A) 70% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 30% to the Manager in payment of the Manager's promote;

(iii)    Third, (A) 50% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 50% to the Manager in payment of the Manager's promote.

a.    .    **Capital Event.** All available cash and other property available for distribution (if any) due to a capital event (i.e. a sale or refinance of the Property), shall be distributed to the Members from time to time, as determined by the Manager, in the order of priority set forth in Section 9.a. above. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return  on its Capital Contribution then outstanding in accordance with each Member's Capital Percentage Interest, and then (ii) to the Members, in return of each Member's aggregate Capital Contribution, pro-rata in accordance with each Member's respective Capital Percentage Interest, and then (iii) once all Member's Capital Contribution are reduced to $0.00, to the Members in accordance with each Member's Ownership Percentage Interest.

b.    The Members shall not receive out of Company property any part of their Capital Contributions until all liabilities of the Company (if any) have been paid or there remains property of the Company sufficient to pay them. All items of Company profit, loss, gain, deduction and credit shall be allocated among the Members pro rata, in proportion to their respective Ownership Percentage Interests.

c.    The Members agree and acknowledge that in consideration for the ability to invest in the Company, the Members will pay the Promote to the Manager, which Promote shall reduce their Capital Percentage Interest by the Promote amount to the Ownership Capital Interest.

10.    <u>Tax; Tax Elections</u>.  The Company shall maintain a capital account for each of the Members in accordance with the rules set forth in Treas. Reg. § 1.704-1 and 1.704-2.  Any elections required or permitted to be made by the Company under the Internal Revenue Code of 1986, as amended, (the "<u>Code</u>") shall be made by the Manager in such manner as the Manager

shall determine.  In the event of an audit of the Company by the Internal Revenue Service, the Manager shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and shall comply with all of its obligations as such under the Code and the regulations promulgated thereunder.

11.    Transfers; Additional Members.  Except as expressly set forth in this Section 11, no Member may sell, convey, assign, encumber or otherwise transfer (collectively, "Transfer") its Ownership Percentage Interest or Capital Percentage Interest or any part thereof, without the prior written consent of the Manager; provided however, that a Member shall have the right to make the following transfers without the consent of the Manager:  (a) a transfer by will or intestacy and (b) a transfer to any parent, child, spouse, grandchild or sibling of such Member or any trust for the benefit of any such individual.  No person or entity may become an additional Member without the prior written consent of the Manager, except that any person or entity that is a transferee of an interest as a result of a Transfer permitted hereunder may become a Member without such consent.  Notwithstanding the foregoing, no transferee or additional Member shall become a Member until it shall have executed and delivered to the Manager an agreement in which such transferee or additional Member assumes and agrees to be bound by all of the terms and conditions of this Agreement.

12.    Dissolution. The Company shall be dissolved and its affairs shall be wound up in accordance with the Act upon the earlier to occur of: (i) the written action of dissolution taken by the Manager; or (ii) upon any event or action causing dissolution of the Company as specified in the Act.  Upon dissolution, the Company shall not be terminated and shall continue in effect until a certificate of dissolution or its equivalent has been issued by the Secretary of State of Delaware.

13.    Maintenance of Books and Records; Accounts.

(a)    Complete and accurate books and accounts shall be kept and maintained for the Company at the Company's principal place of business or at such other place as the Manager shall select.  Such books and accounts shall be kept for fiscal and tax purposes on the cash or accrual basis, as the Manager shall determine, and shall include separate accounts for each Member.  A list of the names and addresses of the Members shall be maintained as part of the books and records of the Company.  Each Member or such Member's duly authorized representative, at such Member's own expense and upon delivering advance written notice to the Company, shall at all reasonable times have access to, and may inspect and make copies of, such books and accounts and any other records of the Company.

(b)    All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Manager may designate from time to time, and withdrawals therefrom shall be made upon the signature, on behalf of the Company, as the Manager may designate from time to time.  In the sole and absolute discretion of the Manager, all deposits and other funds not needed in the operation of the Company's business may be deposited in interest-bearing bank accounts, in money market funds, or invested in treasury bills, certificates of deposit, U.S. government security-backed repurchase agreements or similar short-term money market instruments, or funds investing in any of the foregoing or similar types of short-term investments.

14.    Title to Property.  Title to any property, real or personal, owned by or leased to the Company shall be held in the name of the Company.

15. <u>Exculpation; Liability of the Members and the Manager</u>. Neither of the Members nor the Manager shall have any liability for the obligations or liabilities of the Company, except to the extent otherwise expressly mandated by the Act. No Member or Manager shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Manager by this Agreement.

16. <u>Benefits of Agreement</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of the Company or by any person other than the Manager or a party to this Agreement and its permitted successors and assigns (subject to the express provisions of Section 11 of this Agreement).

17. <u>Indemnification</u>. The Company, or its receiver or trustee, shall pay all judgments and claims asserted by anyone (a "<u>Claimant</u>") against, and shall indemnify and save harmless, the Manager from, any liability or damage to a Claimant incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including, without limitation, reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, including all such liabilities under the Act.

18. <u>Engaging In Other Activities</u>. Notwithstanding any provision contained in this Agreement to the contrary, any Member or the Manager may engage in, invest in, participate in or otherwise enter into other business ventures of any kind, nature and description, alone or with others, including, without limitation, the acquisition, ownership, financing, leasing, operation, management or development of any interests in any business or asset, and the Company shall not have any right in or to any such activities or the income or profits derived therefrom.

19. <u>Reimbursement of Expenses</u>. The Company shall reimburse the Manager for reasonable business expenses incurred in connection with the Manager's activities conducted on behalf of the Company.

20. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

21. <u>Amendments</u>. This Agreement may be amended only by the written consent of the Members.

22. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the parties hereto pertaining to its subject matter. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

23. <u>Notices</u>. All notices and other communications to be given or to be served upon the Company, the Manager or a Member in connection with this Agreement must be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by telecopier with automatic confirmation of transmission or (iii) delivered by federal express or other reputable express delivery service; provided, in any case, that the same is directed to the intended recipient at the address specified for such intended recipient on <u>Schedule A</u> hereto, and, with respect to the

Company and the Manager, at the address of the Company set forth in Section 1 of this Agreement. Any Member or the Company may, at any time, designate any other address in substitution of the foregoing address to which any such notice will be given.

      24.   <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The undersigned Member acknowledges receipt of this Agreement which has not been signed by the other Members.

IN WITNESS WHEREOF, the undersigned, by executing this signature page, hereby adopts and agrees to all the terms, conditions and representations contained in this Operating Agreement of which this signature page is a part of.

**MEMBER:**


_____
**By:**

**Address:** 123 Harvard St Lakewood NJ 08701
**SS#/ EIN:** ███████



**Manager for: Park Ave Capital III LLC:**


_____
**By: A Bodek**

**Schedule A**

| Member | Address | Capital Contribution | Capital Percentage Interest | Ownership Percentage Interest |
|---|---|---|---|---|
| Halpert Family Holdings LLC | 1230 Harvard St Lakewwod NJ 08701 | $500,000 | **14.285%** | |

### AMENDED AND RESTATED OPERATING AGREEMENT
### OF Park Ave Capital III LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of, a Delaware limited liability company (the "Company") is dated as of August 27, 2021, between the Manager (as defined below) and all of the parties who sign copies of this Agreement as members of the Company (collectively referred to herein as the "Members" and individually as a "Member").

### W I T N E S S E T H:

WHEREAS, the Company was formed as a Delaware limited liability company under the name "Park Ave Capital III LLC", on August 24, 20201 by the filing of its Certificate of Formation (the "Certificate") with the Secretary of State of the State of Delaware, in accordance with the Limited Liability Company Act of the State of Delaware, as amended (the "Act"); and

WHEREAS, the Members desire to invest certain sums in the Company, as delineated on Schedule A; and

WHEREAS, some of the Members will receive Ownership Percentage Interests (as hereinafter defined) which are not in accordance with their Capital Percentage Interests (as hereinafter defined) as (the "Manager") is receiving a Promote (as hereinafter defined) on certain Members' Ownership Percentage Interests; and

WHEREAS, the Members desire to enter into this Agreement in order to state the terms and conditions of the ownership, operation and management of the Company.

NOW, THEREFORE, in consideration of the promises and the agreements herein contained and intending to be legally bound hereby, the Members hereby agree as follows:

1.      Name; Office.  The name of the Company is  Park Ave Capital III LLC, The principal place of business for the Company is, or at such other place or places as the Manager may from time to time designate.

2.      Registered Office/Registered Agent.  The address of the registered office of the Company and registered agent of the Company for service of process shall be as designated in the Certificate or any amendment thereof. The registered office and the registered agent may be changed from time to time by the Manager in accordance with the Act.

3.      Certificates.   The Manager may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

Purpose.  The sole business and purposes of the Company are to (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 401 N Lakeshore Dr, Lake Charles, LA 70601.

4.      (the "Property"), and (ii) do any and all other acts or things that may be necessary or incidental to carry on the business activities of the Company in connection therewith as permitted under the Act.

5.      Term.  The term of the Company began as of the date of the filing of the Certificate and shall end on such date as determined by Manager or applicable law.

6.      Capital Contribution.   "Capital Contribution" or "Initial Capital Contribution" shall mean the aggregate net amount of immediately available funds contributed to the Company by a Member.  Simultaneously with the execution of this Agreement, each Member shall make an initial Capital Contribution to the Company in the amount set forth opposite each such Member's name on Schedule A attached hereto.

7.      Additional Contributions.  (i) Each Member shall be obligated to make additional capital contributions (each an "Additional Capital Contribution") as are called for by the Manager (an "Additional Capital Notice").  Additional Capital Contributions shall be made by each Member in accordance with its Capital Percentage Interest as indicated on Schedule A) and shall be made within ten (10) days following the date of the Additional Capital Notice.  The Manager shall do so by delivering to each Member a notice (a "Contribution Notice") specifying: (x) the total amount of the Additional Capital Contribution; (y) each Member's portion of the Additional Capital Contribution (a "Contribution Portion"); and (z) the proposed use of the requested funds.  The Additional Capital Contribution required to be made by each Member shall equal the product obtained by multiplying the total Additional Capital Contribution by such Member's Capital Percentage Interest.

(ii)      Within ten (10) days after the date of the giving of the Contribution Notice, each Member shall contribute to the Company its respective Contribution Portion.  A Member who does so contribute is referred to herein as a "Contributing Member".  If any Member shall fail to contribute all or any portion of its required Contribution Portion within the applicable period of time (a "Declining Member"), then the Manager may send a second notice to the Declining Member stating the amount of the Declining Member's shortfall (the "Shortfall Amount"). If such Declining Member fails to contribute such Shortfall Amount within five (5) days after such notice, the Manager may give notice thereof to all Members (the "Shortfall Notice"), which Shortfall Notice shall offer to each Contributing Member an opportunity to contribute to the Company all or a portion of the Shortfall Amount.  If there are two or more Contributing Members which desire to fund in accordance with the Shortfall Notice, each Contributing Member shall have the right, exercisable within five (5) days after the giving of the Shortfall Notice, to contribute to the Company an amount equal to their Capital Percentage Interest of the Shortfall Amount.  In the event that the Contributing Members do not, in response to the Shortfall Notice, contribute to the Company the entire amount of the Shortfall Amount, then any of the Contributing Members who contributed toward the Shortfall Amount, together with the Manager shall have the right to contribute all or any portions of such remaining Shortfall Amount to the Company.  Each contribution by a Contributing Member of a Shortfall Amount is referred to herein as "Default Capital Contribution" (it being understood that Default Capital Contributions shall also include capital contributions designated elsewhere in the Operating Agreement as Default Capital Contributions).

(iii)      A Contributing Member may elect, within ten (10) days of the making of a Default Capital Contribution, to have its Default Capital Contribution treated as a loan by the Contributing Member to the Declining Member (each a "Default Loan"); each such loan shall bear interest at a rate of eighteen percent (18%) per annum, al pi Heter Iska.

(iv)      If  a Contributing Member shall (1) not have timely elected to have its Default Capital Contribution as a Default Loan, or (2) at any time (but following ten (10) days

written notice to repay from the Contributing Member to the Declining Member) elect to covert its Default Loan to Default Capital Contribution, then the Declining Member's Capital Percentage Interest and Ownership Percentage Interest, as applicable, shall be reduced by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by Contributing Members and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. The Capital Percentage Interest and Ownership Percentage Interest, as applicable, of each Contributing Member making a Default Capital Contribution shall be increased by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by such Contributing Member and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. (Upon the occurrence of the cram-down herein set forth, any balance due in respect of the applicable Default Loan that was converted into an equity interest shall be deemed repaid).

(v)     Any such increase in the Contributing Member's Capital Percentage Interest and Ownership Percentage Interest and reduction in the Declining Member's Capital Percentage Interest and Ownership Percentage Interest in the Company shall be treated for Federal income tax purposes as a sale of the Percentage Interest from the Declining Member to the Contributing Member in consideration for the cancellation of the Declining Member's obligation to repay the capital advanced by the Contributing Member on behalf of the Non-Contributing Member.

(vi)     The Declining Member shall, at the request of a Contributing Member, execute and deliver such amendments to this Agreement as the Contributing Member may reasonably request to reflect the adjustments pursuant to this Section. Such certification or amendments, however, shall not be required to give force or effect to this Section. In the event Declining Member fails to execute such documents, Manager is hereby appointed as power of attorney, coupled with an interest to execute such documents.

(vii)     Any Default Loan and interest due thereon shall be deemed recourse to the Declining Member and, in addition to all rights and remedies, shall repaid from distributions otherwise payable to the Declining Member (though such distributions shall have been deemed distributed to the Declining Member) for tax purposes.

(viii)     Notwithstanding anything contained in this Section 7, the Manager shall have no obligation to make any Additional Capital Contributions; however, the Manager may be a Contributing Member in the event there is a Declining Member.

8.     <u>Management of the Company</u>. The business and affairs of the Company shall be managed by the Manager, who shall have the exclusive power and authority, on behalf of the Company, to take any action of any kind consistent with the provisions of this Agreement and the Act, and to do anything and everything it deems necessary or appropriate to carry on the business and purposes of the Company including but not limited to the right to sell, and/ or mortgage/finance the Company's assets without requiring the consent of the Member. The Manager shall have the exclusive power and authority to appoint an authorized signatory to execute any and all documents on behalf of the Company. The Manager is, to the extent of its rights and powers set forth in this Agreement and the Act, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

9.    <u>Distributions; Allocations.</u>

.    **Operating Income.** All available cash and other property available for distribution (if any) due to operating income (revenue from the Property less operating expenses, any loan payments and capital expenditures), shall be distributed to the Members from time to time, as determined by the Manager.  All distributions shall be made on an annual basis in the following order of priority:

(i)    First, pro rata to the Members in accordance with each Member's respective Capital Percentage Interest until each Member shall have received an 8% annual return on such Member's Capital Contribution to the Company;

(ii)    Second, until each Member shall have received an aggregate annual return on such Member's Capital Contribution equal to 15% (inclusive of the 8% return under Section 9.a.(i) above), (A) 70% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 30% to the Manager in payment of the Manager's promote;

(iii)    Third, (A) 50% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 50% to the Manager in payment of the Manager's promote.

a.    .    **Capital Event.** All available cash and other property available for distribution (if any) due to a capital event (i.e. a sale or refinance of the Property), shall be distributed to the Members from time to time, as determined by the Manager, in the order of priority set forth in Section 9.a. above. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return  on its Capital Contribution then outstanding in accordance with each Member's Capital Percentage Interest, and then (ii) to the Members, in return of each Member's aggregate Capital Contribution, pro-rata in accordance with each Member's respective Capital Percentage Interest, and then (iii) once all Member's Capital Contribution are reduced to $0.00, to the Members in accordance with each Member's Ownership Percentage Interest.

b.    The Members shall not receive out of Company property any part of their Capital Contributions until all liabilities of the Company (if any) have been paid or there remains property of the Company sufficient to pay them. All items of Company profit, loss, gain, deduction and credit shall be allocated among the Members pro rata, in proportion to their respective Ownership Percentage Interests.

c.    The Members agree and acknowledge that in consideration for the ability to invest in the Company, the Members will pay the Promote to the Manager, which Promote shall reduce their Capital Percentage Interest by the Promote amount to the Ownership Capital Interest.

10.    <u>Tax; Tax Elections</u>.  The Company shall maintain a capital account for each of the Members in accordance with the rules set forth in Treas. Reg. § 1.704-1 and 1.704-2.  Any elections required or permitted to be made by the Company under the Internal Revenue Code of 1986, as amended, (the "<u>Code</u>") shall be made by the Manager in such manner as the Manager

shall determine.  In the event of an audit of the Company by the Internal Revenue Service, the Manager shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and shall comply with all of its obligations as such under the Code and the regulations promulgated thereunder.

11.    <u>Transfers; Additional Members</u>.  Except as expressly set forth in this Section 11, no Member may sell, convey, assign, encumber or otherwise transfer (collectively, "<u>Transfer</u>") its Ownership Percentage Interest or Capital Percentage Interest or any part thereof, without the prior written consent of the Manager; <u>provided</u> <u>however</u>, that a Member shall have the right to make the following transfers without the consent of the Manager:  (a) a transfer by will or intestacy and (b) a transfer to any parent, child, spouse, grandchild or sibling of such Member or any trust for the benefit of any such individual.  No person or entity may become an additional Member without the prior written consent of the Manager, except that any person or entity that is a transferee of an interest as a result of a Transfer permitted hereunder may become a Member without such consent.  Notwithstanding the foregoing, no transferee or additional Member shall become a Member until it shall have executed and delivered to the Manager an agreement in which such transferee or additional Member assumes and agrees to be bound by all of the terms and conditions of this Agreement.

12.    <u>Dissolution</u>.  The Company shall be dissolved and its affairs shall be wound up in accordance with the Act upon the earlier to occur of: (i) the written action of dissolution taken by the Manager; or (ii) upon any event or action causing dissolution of the Company as specified in the Act.  Upon dissolution, the Company shall not be terminated and shall continue in effect until a certificate of dissolution or its equivalent has been issued by the Secretary of State of Delaware.

13.    <u>Maintenance of Books and Records; Accounts</u>.

(a)    Complete and accurate books and accounts shall be kept and maintained for the Company at the Company's principal place of business or at such other place as the Manager shall select.  Such books and accounts shall be kept for fiscal and tax purposes on the cash or accrual basis, as the Manager shall determine, and shall include separate accounts for each Member.  A list of the names and addresses of the Members shall be maintained as part of the books and records of the Company.  Each Member or such Member's duly authorized representative, at such Member's own expense and upon delivering advance written notice to the Company, shall at all reasonable times have access to, and may inspect and make copies of, such books and accounts and any other records of the Company.

(b)    All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Manager may designate from time to time, and withdrawals therefrom shall be made upon the signature, on behalf of the Company, as the Manager may designate from time to time.  In the sole and absolute discretion of the Manager, all deposits and other funds not needed in the operation of the Company's business may be deposited in interest-bearing bank accounts, in money market funds, or invested in treasury bills, certificates of deposit, U.S. government security-backed repurchase agreements or similar short-term money market instruments, or funds investing in any of the foregoing or similar types of short-term investments.

14.    <u>Title to Property</u>.  Title to any property, real or personal, owned by or leased to the Company shall be held in the name of the Company.

15.    <u>Exculpation; Liability of the Members and the Manager</u>.  Neither of the Members nor the Manager shall have any liability for the obligations or liabilities of the Company, except to the extent otherwise expressly mandated by the Act.  No Member or Manager shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Manager by this Agreement.

16.    <u>Benefits of Agreement</u>.  None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of the Company or by any person other than the Manager or a party to this Agreement and its permitted successors and assigns (subject to the express provisions of Section 11 of this Agreement).

17.    <u>Indemnification</u>.  The Company, or its receiver or trustee, shall pay all judgments and claims asserted by anyone (a "<u>Claimant</u>") against, and shall indemnify and save harmless, the Manager from, any liability or damage to a Claimant incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including, without limitation, reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, including all such liabilities under the Act.

18.    <u>Engaging In Other Activities</u>.  Notwithstanding any provision contained in this Agreement to the contrary, any Member or the Manager may engage in, invest in, participate in or otherwise enter into other business ventures of any kind, nature and description, alone or with others, including, without limitation, the acquisition, ownership, financing, leasing, operation, management or development of any interests in any business or asset, and the Company shall not have any right in or to any such activities or the income or profits derived therefrom.

19.    <u>Reimbursement of Expenses</u>.  The Company shall reimburse the Manager for reasonable business expenses incurred in connection with the Manager's activities conducted on behalf of the Company.

20.    <u>Governing Law</u>.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

21.    <u>Amendments</u>.  This Agreement may be amended only by the written consent of the Members.

22.    <u>Entire Agreement</u>.  This Agreement constitutes the entire agreement among the parties hereto pertaining to its subject matter.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

23.    <u>Notices</u>.  All notices and other communications to be given or to be served upon the Company, the Manager or a Member in connection with this Agreement must be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by telecopier with automatic confirmation of transmission or (iii) delivered by federal express or other reputable express delivery service; provided, in any case, that the same is directed to the intended recipient at the address specified for such intended recipient on <u>Schedule A</u> hereto, and, with respect to the

Company and the Manager, at the address of the Company set forth in Section 1 of this Agreement. Any Member or the Company may, at any time, designate any other address in substitution of the foregoing address to which any such notice will be given.

24.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The undersigned Member acknowledges receipt of this Agreement which has not been signed by the other Members.

IN WITNESS WHEREOF, the undersigned, by executing this signature page, hereby adopts and agrees to all the terms, conditions and representations contained in this Operating Agreement of which this signature page is a part of.

**MEMBER:**

**_____**

**By:**

**Address:**
**SS#/ EIN:** ████████

**Manager for: Park Ave Capital III LLC:**

**_____**

**By: A Bodek**

**Schedule A**

| Member | Address | Capital Contribution | Capital Percentage Interest | Ownership Percentage Interest |
|---|---|---|---|---|
| Alphard Group LLC | 66 Chestnut St STE 8 Yonkern NY 10701 | $900,000 | **25.714%** | |

5,810,000 ÷ by amount 15.55 =373,633.44

**Steps:** 373,633 ÷ 8,300,000 = 0.045016024096386 = 4.5016024096386%

## AMENDED AND RESTATED OPERATING AGREEMENT
## OF Park Ave Capital III LLC

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "Agreement") of, a Delaware limited liability company (the "Company") is dated as of August 27, 2021, between the Manager (as defined below) and all of the parties who sign copies of this Agreement as members of the Company (collectively referred to herein as the "Members" and individually as a "Member").

W I T N E S S E T H:

WHEREAS, the Company was formed as a Delaware limited liability company under the name "Park Ave Capital III LLC", on August 24, 20201 by the filing of its Certificate of Formation (the "Certificate") with the Secretary of State of the State of Delaware, in accordance with the Limited Liability Company Act of the State of Delaware, as amended (the "Act"); and

WHEREAS, the Members desire to invest certain sums in the Company, as delineated on Schedule A; and

WHEREAS, some of the Members will receive Ownership Percentage Interests (as hereinafter defined) which are not in accordance with their Capital Percentage Interests (as hereinafter defined) as (the "Manager") is receiving a Promote (as hereinafter defined) on certain Members' Ownership Percentage Interests; and

WHEREAS, the Members desire to enter into this Agreement in order to state the terms and conditions of the ownership, operation and management of the Company.

NOW, THEREFORE, in consideration of the promises and the agreements herein contained and intending to be legally bound hereby, the Members hereby agree as follows:

1.    Name; Office.  The name of the Company is Park Ave Capital III LLC, The principal place of business for the Company is, or at such other place or places as the Manager may from time to time designate.

2.    Registered Office/Registered Agent.  The address of the registered office of the Company and registered agent of the Company for service of process shall be as designated in the Certificate or any amendment thereof. The registered office and the registered agent may be changed from time to time by the Manager in accordance with the Act.

3.    Certificates.  The Manager may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

4.    Purpose.  The sole business and purposes of the Company are to (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 4724 Round Lake Road, Indianapolis, Indiana (the "Property"), and (ii) do any and all other acts or things that may be necessary or incidental to carry on the business activities of the Company in connection therewith as permitted under the Act.

5.    Term.  The term of the Company began as of the date of the filing of the Certificate and shall end on such date as determined by Manager or applicable law.

6.    Capital Contribution.    "Capital Contribution" or "Initial Capital Contribution" shall mean the aggregate net amount of immediately available funds contributed to the Company by a Member. Simultaneously with the execution of this Agreement, each Member shall make an initial Capital Contribution to the Company in the amount set forth opposite each such Member's name on Schedule A attached hereto.

7.    Additional Contributions.    (i) Each Member shall be obligated to make additional capital contributions (each an "Additional Capital Contribution") as are called for by the Manager (an "Additional Capital Notice"). Additional Capital Contributions shall be made by each Member in accordance with its Capital Percentage Interest as indicated on Schedule A) and shall be made within ten (10) days following the date of the Additional Capital Notice. The Manager shall do so by delivering to each Member a notice (a "Contribution Notice") specifying: (x) the total amount of the Additional Capital Contribution; (y) each Member's portion of the Additional Capital Contribution (a "Contribution Portion"); and (z) the proposed use of the requested funds. The Additional Capital Contribution required to be made by each Member shall equal the product obtained by multiplying the total Additional Capital Contribution by such Member's Capital Percentage Interest.

(ii)    Within ten (10) days after the date of the giving of the Contribution Notice, each Member shall contribute to the Company its respective Contribution Portion. A Member who does so contribute is referred to herein as a "Contributing Member". If any Member shall fail to contribute all or any portion of its required Contribution Portion within the applicable period of time (a "Declining Member"), then the Manager may send a second notice to the Declining Member stating the amount of the Declining Member's shortfall (the "Shortfall Amount"). If such Declining Member fails to contribute such Shortfall Amount within five (5) days after such notice, the Manager may give notice thereof to all Members (the "Shortfall Notice"), which Shortfall Notice shall offer to each Contributing Member an opportunity to contribute to the Company all or a portion of the Shortfall Amount. If there are two or more Contributing Members which desire to fund in accordance with the Shortfall Notice, each Contributing Member shall have the right, exercisable within five (5) days after the giving of the Shortfall Notice, to contribute to the Company an amount equal to their Capital Percentage Interest of the Shortfall Amount. In the event that the Contributing Members do not, in response to the Shortfall Notice, contribute to the Company the entire amount of the Shortfall Amount, then any of the Contributing Members who contributed toward the Shortfall Amount, together with the Manager shall have the right to contribute all or any portions of such remaining Shortfall Amount to the Company. Each contribution by a Contributing Member of a Shortfall Amount is referred to herein as "Default Capital Contribution" (it being understood that Default Capital Contributions shall also include capital contributions designated elsewhere in the Operating Agreement as Default Capital Contributions).

(iii)    A Contributing Member may elect, within ten (10) days of the making of a Default Capital Contribution, to have its Default Capital Contribution treated as a loan by the Contributing Member to the Declining Member (each a "Default Loan"); each such loan shall bear interest at a rate of eighteen percent (18%) per annum, al pi Heter Iska.

(iv)    If a Contributing Member shall (1) not have timely elected to have its Default Capital Contribution as a Default Loan, or (2) at any time (but following ten (10) days written notice to repay from the Contributing Member to the Declining Member) elect to covert its Default Loan to Default Capital Contribution, then the Declining Member's Capital Percentage Interest and Ownership Percentage Interest, as applicable, shall be reduced by a percentage, which

percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by Contributing Members and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. The Capital Percentage Interest and Ownership Percentage Interest, as applicable, of each Contributing Member making a Default Capital Contribution shall be increased by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by such Contributing Member and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. (Upon the occurrence of the cram-down herein set forth, any balance due in respect of the applicable Default Loan that was converted into an equity interest shall be deemed repaid).

(v)    Any such increase in the Contributing Member's Capital Percentage Interest and Ownership Percentage Interest and reduction in the Declining Member's Capital Percentage Interest and Ownership Percentage Interest in the Company shall be treated for Federal income tax purposes as a sale of the Percentage Interest from the Declining Member to the Contributing Member in consideration for the cancellation of the Declining Member's obligation to repay the capital advanced by the Contributing Member on behalf of the Non-Contributing Member.

(vi)    The Declining Member shall, at the request of a Contributing Member, execute and deliver such amendments to this Agreement as the Contributing Member may reasonably request to reflect the adjustments pursuant to this Section. Such certification or amendments, however, shall not be required to give force or effect to this Section. In the event Declining Member fails to execute such documents, Manager is hereby appointed as power of attorney, coupled with an interest to execute such documents.

(vii)    Any Default Loan and interest due thereon shall be deemed recourse to the Declining Member and, in addition to all rights and remedies, shall repaid from distributions otherwise payable to the Declining Member (though such distributions shall have been deemed distributed to the Declining Member) for tax purposes.

(viii)    Notwithstanding anything contained in this Section 7, the Manager shall have no obligation to make any Additional Capital Contributions; however, the Manager may be a Contributing Member in the event there is a Declining Member.

8.    <u>Management of the Company</u>.  The business and affairs of the Company shall be managed by the Manager, who shall have the exclusive power and authority, on behalf of the Company, to take any action of any kind consistent with the provisions of this Agreement and the Act, and to do anything and everything it deems necessary or appropriate to carry on the business and purposes of the Company including but not limited to the right to sell, and/ or mortgage/finance the Company's assets without requiring the consent of the Member. The Manager shall have the exclusive power and authority to appoint an authorized signatory to execute any and all documents on behalf of the Company. The Manager is, to the extent of its rights and powers set forth in this Agreement and the Act, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

9.    <u>Distributions; Allocations</u>.

a.      **Operating Income.** All available cash and other property available for distribution (if any) due to operating income (revenue from the Property less operating expenses, any loan payments and capital expenditures), shall be distributed to the Members from time to time, as determined by the Manager. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return on its Capital Contribution in accordance with each Member's Capital Percentage Interest and then (ii) to the Members in accordance with each Member's respective Capital Percentage Interest less a 30% promote (the "Promote") to the Manager till the return amounts to a total of 15% annual return, all distributions beyond the 15% shall be split 50% with manager which is set forth on Schedule A and defined in this Agreement as the "Ownership Percentage Interest".

b.      **Capital Event.** All available cash and other property available for distribution (if any) due to a capital event (i.e. a sale or refinance of the Property), shall be distributed to the Members from time to time, as determined by the Manager. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return on its Capital Contribution then outstanding in accordance with each Member's Capital Percentage Interest, and then (ii) to the Members, in return of each Member's aggregate Capital Contribution, pro-rata in accordance with each Member's respective Capital Percentage Interest, and then (iii) once all Member's Capital Contribution are reduced to $0.00, to the Members in accordance with each Member's Ownership Percentage Interest.

c.      The Members shall not receive out of Company property any part of their Capital Contributions until all liabilities of the Company (if any) have been paid or there remains property of the Company sufficient to pay them. All items of Company profit, loss, gain, deduction and credit shall be allocated among the Members pro rata, in proportion to their respective Ownership Percentage Interests.

d.      The Members agree and acknowledge that in consideration for the ability to invest in the Company, the Members will pay the Promote to the Manager, which Promote shall reduce their Capital Percentage Interest by the Promote amount to the Ownership Capital Interest.

10.     Tax; Tax Elections. The Company shall maintain a capital account for each of the Members in accordance with the rules set forth in Treas. Reg. § 1.704-1 and 1.704-2. Any elections required or permitted to be made by the Company under the Internal Revenue Code of 1986, as amended, (the "Code") shall be made by the Manager in such manner as the Manager shall determine. In the event of an audit of the Company by the Internal Revenue Service, the Manager shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and shall comply with all of its obligations as such under the Code and the regulations promulgated thereunder.

11.     Transfers; Additional Members. Except as expressly set forth in this Section 11, no Member may sell, convey, assign, encumber or otherwise transfer (collectively, "Transfer") its Ownership Percentage Interest or Capital Percentage Interest or any part thereof, without the prior written consent of the Manager; provided however, that a Member shall have the right to make the following transfers without the consent of the Manager: (a) a transfer by will or intestacy and (b) a transfer to any parent, child, spouse, grandchild or sibling of such Member or any trust for the benefit of any such individual. No person or entity may become an additional Member without the prior written consent of the Manager, except that any person or entity that is a transferee of an interest as a result of a Transfer permitted hereunder may become a Member without such consent. Notwithstanding the foregoing, no transferee or additional Member shall

become a Member until it shall have executed and delivered to the Manager an agreement in which such transferee or additional Member assumes and agrees to be bound by all of the terms and conditions of this Agreement.

12.    Dissolution. The Company shall be dissolved and its affairs shall be wound up in accordance with the Act upon the earlier to occur of: (i) the written action of dissolution taken by the Manager; or (ii) upon any event or action causing dissolution of the Company as specified in the Act. Upon dissolution, the Company shall not be terminated and shall continue in effect until a certificate of dissolution or its equivalent has been issued by the Secretary of State of Delaware.

13.    Maintenance of Books and Records; Accounts.

(a)    Complete and accurate books and accounts shall be kept and maintained for the Company at the Company's principal place of business or at such other place as the Manager shall select. Such books and accounts shall be kept for fiscal and tax purposes on the cash or accrual basis, as the Manager shall determine, and shall include separate accounts for each Member. A list of the names and addresses of the Members shall be maintained as part of the books and records of the Company. Each Member or such Member's duly authorized representative, at such Member's own expense and upon delivering advance written notice to the Company, shall at all reasonable times have access to, and may inspect and make copies of, such books and accounts and any other records of the Company.

(b)    All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Manager may designate from time to time, and withdrawals therefrom shall be made upon the signature, on behalf of the Company, as the Manager may designate from time to time. In the sole and absolute discretion of the Manager, all deposits and other funds not needed in the operation of the Company's business may be deposited in interest-bearing bank accounts, in money market funds, or invested in treasury bills, certificates of deposit, U.S. government security-backed repurchase agreements or similar short-term money market instruments, or funds investing in any of the foregoing or similar types of short-term investments.

14.    Title to Property. Title to any property, real or personal, owned by or leased to the Company shall be held in the name of the Company.

15.    Exculpation; Liability of the Members and the Manager. Neither of the Members nor the Manager shall have any liability for the obligations or liabilities of the Company, except to the extent otherwise expressly mandated by the Act. No Member or Manager shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Manager by this Agreement.

16.    Benefits of Agreement. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of the Company or by any person other than the Manager or a party to this Agreement and its permitted successors and assigns (subject to the express provisions of Section 11 of this Agreement).

17.    Indemnification. The Company, or its receiver or trustee, shall pay all judgments and claims asserted by anyone (a "Claimant") against, and shall indemnify and save

harmless, the Manager from, any liability or damage to a Claimant incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including, without limitation, reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, including all such liabilities under the Act.

18.    Engaging In Other Activities.  Notwithstanding any provision contained in this Agreement to the contrary, any Member or the Manager may engage in, invest in, participate in or otherwise enter into other business ventures of any kind, nature and description, alone or with others, including, without limitation, the acquisition, ownership, financing, leasing, operation, management or development of any interests in any business or asset, and the Company shall not have any right in or to any such activities or the income or profits derived therefrom.

19.    Reimbursement of Expenses.  The Company shall reimburse the Manager for reasonable business expenses incurred in connection with the Manager's activities conducted on behalf of the Company.

20.    Governing Law.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

21.    Amendments.  This Agreement may be amended only by the written consent of the Members.

22.    Entire Agreement.  This Agreement constitutes the entire agreement among the parties hereto pertaining to its subject matter.  Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

23.    Notices.  All notices and other communications to be given or to be served upon the Company, the Manager or a Member in connection with this Agreement must be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by telecopier with automatic confirmation of transmission or (iii) delivered by federal express or other reputable express delivery service; provided, in any case, that the same is directed to the intended recipient at the address specified for such intended recipient on Schedule A hereto, and, with respect to the Company and the Manager, at the address of the Company set forth in Section 1 of this Agreement. Any Member or the Company may, at any time, designate any other address in substitution of the foregoing address to which any such notice will be given.

24.    Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The undersigned Member acknowledges receipt of this Agreement which has not been signed by the other Members.

IN WITNESS WHEREOF, the undersigned, by executing this signature page, hereby adopts and agrees to all the terms, conditions and representations contained in this Operating Agreement of which this signature page is a part of.

**MEMBER:**

**By:**

**Address:**
**SS#:**

Schedule A

| Member | Address | Capital Contribution | Capital Percentage Interest | Ownership Percentage Interest |
|---|---|---|---|---|
| Lelov investment LLC | | $500,000 | **30%** | 10% |

**AMENDED AND RESTATED OPERATING AGREEMENT**
**OF Park Ave Capital III LLC**

THIS AMENDED AND RESTATED OPERATING AGREEMENT (this "<u>Agreement</u>") of, a Delaware limited liability company (the "<u>Company</u>") is dated as of August 27, 2021, between the Manager (as defined below) and all of the parties who sign copies of this Agreement as members of the Company (collectively referred to herein as the "<u>Members</u>" and individually as a "<u>Member</u>").

<u>W I T N E S S E T H</u>:

WHEREAS, the Company was formed as a Delaware limited liability company under the name "Park Ave Capital III LLC", on August 24, 20201 by the filing of its Certificate of Formation (the "<u>Certificate</u>") with the Secretary of State of the State of Delaware, in accordance with the Limited Liability Company Act of the State of Delaware, as amended (the "<u>Act</u>"); and

WHEREAS, the Members desire to invest certain sums in the Company, as delineated on Schedule A; and

WHEREAS, some of the Members will receive Ownership Percentage Interests (as hereinafter defined) which are not in accordance with their Capital Percentage Interests (as hereinafter defined) as (the "Manager") is receiving a Promote (as hereinafter defined) on certain Members' Ownership Percentage Interests; and

WHEREAS, the Members desire to enter into this Agreement in order to state the terms and conditions of the ownership, operation and management of the Company.

NOW, THEREFORE, in consideration of the promises and the agreements herein contained and intending to be legally bound hereby, the Members hereby agree as follows:

1.    <u>Name; Office</u>.  The name of the Company is  Park Ave Capital III LLC, The principal place of business for the Company is, or at such other place or places as the Manager may from time to time designate.

2.    <u>Registered Office/Registered Agent</u>.  The address of the registered office of the Company and registered agent of the Company for service of process shall be as designated in the Certificate or any amendment thereof. The registered office and the registered agent may be changed from time to time by the Manager in accordance with the Act.

3.    <u>Certificates</u>.  The Manager may execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in any jurisdiction in which the Company may wish to conduct business.

<u>Purpose</u>.  The sole business and purposes of the Company are to (i) acquire, own, entitle, renovate, develop, manage, operate, lease, improve, finance, refinance, market, sell and otherwise dispose of a tenancy in common interest in the property located at 401 N Lakeshore Dr, Lake Charles, LA 70601.

4.    (the "Property"), and (ii) do any and all other acts or things that may be necessary or incidental to carry on the business activities of the Company in connection therewith as permitted under the Act.

5.    Term.  The term of the Company began as of the date of the filing of the Certificate and shall end on such date as determined by Manager or applicable law.

6.    Capital Contribution.  "Capital Contribution" or "Initial Capital Contribution" shall mean the aggregate net amount of immediately available funds contributed to the Company by a Member.  Simultaneously with the execution of this Agreement, each Member shall make an initial Capital Contribution to the Company in the amount set forth opposite each such Member's name on Schedule A attached hereto.

7.    Additional Contributions.  (i) Each Member shall be obligated to make additional capital contributions (each an "Additional Capital Contribution") as are called for by the Manager (an "Additional Capital Notice").  Additional Capital Contributions shall be made by each Member in accordance with its Capital Percentage Interest as indicated on Schedule A) and shall be made within ten (10) days following the date of the Additional Capital Notice.  The Manager shall do so by delivering to each Member a notice (a "Contribution Notice") specifying: (x) the total amount of the Additional Capital Contribution; (y) each Member's portion of the Additional Capital Contribution (a "Contribution Portion"); and (z) the proposed use of the requested funds.  The Additional Capital Contribution required to be made by each Member shall equal the product obtained by multiplying the total Additional Capital Contribution by such Member's Capital Percentage Interest.

(ii)    Within ten (10) days after the date of the giving of the Contribution Notice, each Member shall contribute to the Company its respective Contribution Portion.  A Member who does so contribute is referred to herein as a "Contributing Member".  If any Member shall fail to contribute all or any portion of its required Contribution Portion within the applicable period of time (a "Declining Member"), then the Manager may send a second notice to the Declining Member stating the amount of the Declining Member's shortfall (the "Shortfall Amount"). If such Declining Member fails to contribute such Shortfall Amount within five (5) days after such notice, the Manager may give notice thereof to all Members (the "Shortfall Notice"), which Shortfall Notice shall offer to each Contributing Member an opportunity to contribute to the Company all or a portion of the Shortfall Amount.  If there are two or more Contributing Members which desire to fund in accordance with the Shortfall Notice, each Contributing Member shall have the right, exercisable within five (5) days after the giving of the Shortfall Notice, to contribute to the Company an amount equal to their Capital Percentage Interest of the Shortfall Amount.  In the event that the Contributing Members do not, in response to the Shortfall Notice, contribute to the Company the entire amount of the Shortfall Amount, then any of the Contributing Members who contributed toward the Shortfall Amount, together with the Manager shall have the right to contribute all or any portions of such remaining Shortfall Amount to the Company.  Each contribution by a Contributing Member of a Shortfall Amount is referred to herein as "Default Capital Contribution" (it being understood that Default Capital Contributions shall also include capital contributions designated elsewhere in the Operating Agreement as Default Capital Contributions).

(iii)    A Contributing Member may elect, within ten (10) days of the making of a Default Capital Contribution, to have its Default Capital Contribution treated as a loan by the Contributing Member to the Declining Member (each a "Default Loan"); each such loan shall bear interest at a rate of eighteen percent (18%) per annum, al pi Heter Iska.

(iv)    If  a Contributing Member shall (1) not have timely elected to have its Default Capital Contribution as a Default Loan, or (2) at any time (but following ten (10) days

written notice to repay from the Contributing Member to the Declining Member) elect to covert its Default Loan to Default Capital Contribution, then the Declining Member's Capital Percentage Interest and Ownership Percentage Interest, as applicable, shall be reduced by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by Contributing Members and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. The Capital Percentage Interest and Ownership Percentage Interest, as applicable, of each Contributing Member making a Default Capital Contribution shall be increased by a percentage, which percentage shall be equal to a fraction, the numerator of which shall be an amount equal to 125% of the Default Capital Contribution made by such Contributing Member and the denominator of which shall be the cumulative Initial Capital Contributions and Additional Capital Contributions made by all Members as of such date. (Upon the occurrence of the cram-down herein set forth, any balance due in respect of the applicable Default Loan that was converted into an equity interest shall be deemed repaid).

(v)    Any such increase in the Contributing Member's Capital Percentage Interest and Ownership Percentage Interest and reduction in the Declining Member's Capital Percentage Interest and Ownership Percentage Interest in the Company shall be treated for Federal income tax purposes as a sale of the Percentage Interest from the Declining Member to the Contributing Member in consideration for the cancellation of the Declining Member's obligation to repay the capital advanced by the Contributing Member on behalf of the Non-Contributing Member.

(vi)    The Declining Member shall, at the request of a Contributing Member, execute and deliver such amendments to this Agreement as the Contributing Member may reasonably request to reflect the adjustments pursuant to this Section. Such certification or amendments, however, shall not be required to give force or effect to this Section. In the event Declining Member fails to execute such documents, Manager is hereby appointed as power of attorney, coupled with an interest to execute such documents.

(vii)    Any Default Loan and interest due thereon shall be deemed recourse to the Declining Member and, in addition to all rights and remedies, shall repaid from distributions otherwise payable to the Declining Member (though such distributions shall have been deemed distributed to the Declining Member) for tax purposes.

(viii)    Notwithstanding anything contained in this Section 7, the Manager shall have no obligation to make any Additional Capital Contributions; however, the Manager may be a Contributing Member in the event there is a Declining Member.

8.    <u>Management of the Company</u>.    The business and affairs of the Company shall be managed by the Manager, who shall have the exclusive power and authority, on behalf of the Company, to take any action of any kind consistent with the provisions of this Agreement and the Act, and to do anything and everything it deems necessary or appropriate to carry on the business and purposes of the Company including but not limited to the right to sell, and/ or mortgage/finance the Company's assets without requiring the consent of the Member. The Manager shall have the exclusive power and authority to appoint an authorized signatory to execute any and all documents on behalf of the Company. The Manager is, to the extent of its rights and powers set forth in this Agreement and the Act, an agent of the Company for the purpose of the Company's business, and the actions of the Manager taken in accordance with such rights and powers shall bind the Company.

9. <u>Distributions; Allocations.</u>

.    **Operating Income.** All available cash and other property available for distribution (if any) due to operating income (revenue from the Property less operating expenses, any loan payments and capital expenditures), shall be distributed to the Members from time to time, as determined by the Manager.  All distributions shall be made on an annual basis in the following order of priority:

(i)    First, pro rata to the Members in accordance with each Member's respective Capital Percentage Interest until each Member shall have received an 8% annual return of such Member's Capital Contribution to the Company;

(ii)    Second, until each Member shall have received an aggregate annual return on such Member's Capital Contribution equal to 15% (inclusive of the 8% return under Section 9.a.(i) above), (A) 70% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 30% to the Manager in payment of the Manager's promote;

(iii)    Third, (A) 50% to the Members pro rata in accordance with each Member's respective Capital Percentage Interest, and (B) 50% to the Manager in payment of the Manager's promote.

a.    .    **Capital Event.** All available cash and other property available for distribution (if any) due to a capital event (i.e. a sale or refinance of the Property), shall be distributed to the Members from time to time, as determined by the Manager, in the order of priority set forth in Section 9.a. above. All distributions shall be made on a pro rata basis and allocated as follows on an annual basis: (i) each Member shall receive a 8% annual return  on its Capital Contribution then outstanding in accordance with each Member's Capital Percentage Interest, and then (ii) to the Members, in return of each Member's aggregate Capital Contribution, pro-rata in accordance with each Member's respective Capital Percentage Interest, and then (iii) once all Member's Capital Contribution are reduced to $0.00, to the Members in accordance with each Member's Ownership Percentage Interest.

b.    The Members shall not receive out of Company property any part of their Capital Contributions until all liabilities of the Company (if any) have been paid or there remains property of the Company sufficient to pay them. All items of Company profit, loss, gain, deduction and credit shall be allocated among the Members pro rata, in proportion to their respective Ownership Percentage Interests.

c.    The Members agree and acknowledge that in consideration for the ability to invest in the Company, the Members will pay the Promote to the Manager, which Promote shall reduce their Capital Percentage Interest by the Promote amount to the Ownership Capital Interest.

10.    <u>Tax; Tax Elections</u>.  The Company shall maintain a capital account for each of the Members in accordance with the rules set forth in Treas. Reg. § 1.704-1 and 1.704-2.  Any elections required or permitted to be made by the Company under the Internal Revenue Code of 1986, as amended, (the "<u>Code</u>") shall be made by the Manager in such manner as the Manager

shall determine.  In the event of an audit of the Company by the Internal Revenue Service, the Manager shall act as the "tax matters partner" pursuant to Section 6231(a)(7) of the Code, and shall comply with all of its obligations as such under the Code and the regulations promulgated thereunder.

11.    Transfers; Additional Members.  Except as expressly set forth in this Section 11, no Member may sell, convey, assign, encumber or otherwise transfer (collectively, "Transfer") its Ownership Percentage Interest or Capital Percentage Interest or any part thereof, without the prior written consent of the Manager; provided however, that a Member shall have the right to make the following transfers without the consent of the Manager:  (a) a transfer by will or intestacy and (b) a transfer to any parent, child, spouse, grandchild or sibling of such Member or any trust for the benefit of any such individual.  No person or entity may become an additional Member without the prior written consent of the Manager, except that any person or entity that is a transferee of an interest as a result of a Transfer permitted hereunder may become a Member without such consent.  Notwithstanding the foregoing, no transferee or additional Member shall become a Member until it shall have executed and delivered to the Manager an agreement in which such transferee or additional Member assumes and agrees to be bound by all of the terms and conditions of this Agreement.

12.    Dissolution.  The Company shall be dissolved and its affairs shall be wound up in accordance with the Act upon the earlier to occur of: (i) the written action of dissolution taken by the Manager; or (ii) upon any event or action causing dissolution of the Company as specified in the Act.  Upon dissolution, the Company shall not be terminated and shall continue in effect until a certificate of dissolution or its equivalent has been issued by the Secretary of State of Delaware.

13.    Maintenance of Books and Records; Accounts.

(a)    Complete and accurate books and accounts shall be kept and maintained for the Company at the Company's principal place of business or at such other place as the Manager shall select.  Such books and accounts shall be kept for fiscal and tax purposes on the cash or accrual basis, as the Manager shall determine, and shall include separate accounts for each Member.  A list of the names and addresses of the Members shall be maintained as part of the books and records of the Company.  Each Member or such Member's duly authorized representative, at such Member's own expense and upon delivering advance written notice to the Company, shall at all reasonable times have access to, and may inspect and make copies of, such books and accounts and any other records of the Company.

(b)    All funds received by the Company shall be deposited in the name of the Company in such bank account or accounts as the Manager may designate from time to time, and withdrawals therefrom shall be made upon the signature, on behalf of the Company, as the Manager may designate from time to time.  In the sole and absolute discretion of the Manager, all deposits and other funds not needed in the operation of the Company's business may be deposited in interest-bearing bank accounts, in money market funds, or invested in treasury bills, certificates of deposit, U.S. government security-backed repurchase agreements or similar short-term money market instruments, or funds investing in any of the foregoing or similar types of short-term investments.

14.    Title to Property.  Title to any property, real or personal, owned by or leased to the Company shall be held in the name of the Company.

15. <u>Exculpation; Liability of the Members and the Manager</u>. Neither of the Members nor the Manager shall have any liability for the obligations or liabilities of the Company, except to the extent otherwise expressly mandated by the Act. No Member or Manager shall be liable to the Company or any other Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member or Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on such Member or Manager by this Agreement.

16. <u>Benefits of Agreement</u>. None of the provisions of this Agreement shall be for the benefit of, or enforceable by, any creditor of the Company or by any person other than the Manager or a party to this Agreement and its permitted successors and assigns (subject to the express provisions of Section 11 of this Agreement).

17. <u>Indemnification</u>. The Company, or its receiver or trustee, shall pay all judgments and claims asserted by anyone (a "<u>Claimant</u>") against, and shall indemnify and save harmless, the Manager from, any liability or damage to a Claimant incurred by reason of any act performed or omitted to be performed by the Manager in connection with the business of the Company, including, without limitation, reasonable attorneys' fees incurred by the Manager in connection with the defense of any action based on any such act or omission, including all such liabilities under the Act.

18. <u>Engaging In Other Activities</u>. Notwithstanding any provision contained in this Agreement to the contrary, any Member or the Manager may engage in, invest in, participate in or otherwise enter into other business ventures of any kind, nature and description, alone or with others, including, without limitation, the acquisition, ownership, financing, leasing, operation, management or development of any interests in any business or asset, and the Company shall not have any right in or to any such activities or the income or profits derived therefrom.

19. <u>Reimbursement of Expenses</u>. The Company shall reimburse the Manager for reasonable business expenses incurred in connection with the Manager's activities conducted on behalf of the Company.

20. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to conflicts of law principles of such State.

21. <u>Amendments</u>. This Agreement may be amended only by the written consent of the Members.

22. <u>Entire Agreement</u>. This Agreement constitutes the entire agreement among the parties hereto pertaining to its subject matter. Each Member agrees to execute and deliver such additional documents and instruments and to perform such additional acts as may be necessary or appropriate to effectuate, carry out and perform the terms, provisions and conditions of this Agreement.

23. <u>Notices</u>. All notices and other communications to be given or to be served upon the Company, the Manager or a Member in connection with this Agreement must be in writing and shall be deemed given when (i) delivered by hand, (ii) transmitted by telecopier with automatic confirmation of transmission or (iii) delivered by federal express or other reputable express delivery service; provided, in any case, that the same is directed to the intended recipient at the address specified for such intended recipient on <u>Schedule A</u> hereto, and, with respect to the

Company and the Manager, at the address of the Company set forth in Section 1 of this Agreement. Any Member or the Company may, at any time, designate any other address in substitution of the foregoing address to which any such notice will be given.

24.    <u>Counterparts</u>.    This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument. The undersigned Member acknowledges receipt of this Agreement which has not been signed by the other Members.

IN WITNESS WHEREOF, the undersigned, by executing this signature page, hereby adopts and agrees to all the terms, conditions and representations contained in this Operating Agreement of which this signature page is a part of.

**MEMBER:**


**By:**


**Address:**
**SS#/ EIN**


**Manager for: Park Ave Capital III LLC:**


**By: A Bodek**

**Schedule A**

| Member | Address | Capital Contribution | Capital Percentage Interest | Ownership Percentage Interest |
|---|---|---|---|---|
| Clearcut Glass LLC | 1758 Ridge Ave, Lakewood NJ 08701 | $225,000 | **6.428%** | **4.501%** |